(PRIŻE.)

## The PIZARRO—*Hibberson* and *Yonge,* Claimants.

If the court below deny an order for farther proof when it ought to be granted, or allow it when it ought to be denied, and the objection is taken by the party, and appears on the record, the appellate court can administer the proper relief.

But, if evidence in the nature of farther proof be introduced, and no formal order or objection appear on the record, it must be presumed to have been done by consent, and the irregularity is waived.

Concealment, or spoliation of papers, is not, *per se,* a sufficient ground for condemnation in a prize court. It is calculated to excite the vigilance and justify the suspicions of the court; but is open to explanation: and if the party, in the first instance fairly, frankly, and satisfactorily explains it, he is deprived of no right to which he is otherwise entitled. If, on the contrary, the spoliation is unexplained, or the explanation is unsatisfactory; if the cause labour under heavy suspicions, or gross prevarications; farther proof is denied, and condemnation ensues from defects in the evidence which the party is not permitted to supply.

Under the Spanish treaty of 1795, stipulating that free ships shall make free goods, the want of such a sea letter or passport, or such certificates as are described in the 17th article, is not a substantive ground of condemnation. It only authorizes capture and sending in for adjudication, and the proprietary interest in the ship may be proved by other equivalent testimony. But if, upon the original evidence, the cause appears extremely doubtful and suspicious, and farther proof is necessary, the grant or denial of it rests on the same general rules which govern the discretion of prize courts in other cases.

The term " subjects," in the 15th article, when applied to person owing allegiance to Spain, must be construed in the same sense as the term " citizens," or " inhabitants," when applied to persons owing allegiance to the United States, and extends to all persons domiciled in the Spanish dominions.

The Spanish character of the *ship* being ascertained, the proprietary interest of the *cargo* cannot be inquired into, unless so far as to ascertain that it does not belong to citizens of the United States, whose property, engaged in trade with the enemy, is not protected by the treaty.

APPEAL from the circuit court of the district of Georgia.

The ship Pizarro, under Spanish colours, was captured on the 23d of July, 1814, by the private armed schooner Midas, Alexander Thompson, commander, on a voyage from Liverpool to Amelia Island, and brought into the port of Savannah for adjudication. Prize proceedings were instituted in the district court of Georgia against the ship and cargo, and a claim was duly interposed by Messrs. Hibberson and Yonge, merchants, of Fernandina, Amelia Island, for the ship and cargo, as their sole and exclusive property. Upon the final hearing in the district court, the ship and cargo were decreed to be restored, and this decree was, upon an appeal to the circuit court, affirmed; and from the decree of the circuit court the cause was brought by appeal to this court.

It appears from the evidence, that during the voyage a package, containing papers respecting the cargo, directed to Messrs. Hibberson and Yonge, was thrown overboard by the advice and assent of the master and supercargo. The reason alleged for this proceeding is, that they were then chased by a schooner, which they supposed to be a Carthaginian privateer. The ship's documents, however, were

retained, in which her Spanish character is distinctly asserted.

These documents were as follows: 1. A certificate of the Spanish consul at Liverpool, dated the 11th of September, 1813, certifying that the Pizarro was a Spanish ship, bound to Corunna. 2. A certificate from the same, of the same date, that Messrs. Hughes and Duncan had shipped 250 tons of salt on board the Pizarro for Corunna, consigned to Messrs. Hibberson and Yonge. 3. A certificate of health, dated at Fernandina, the 20th of December, 1813. 4. A letter from Messrs. Hibberson and Yonge, of the 10th January, 1814, to J. Walton, the navigator or sea pilot, ordering him to sail to Liverpool. 5. A bill of lading, signed by Martinez, the master, for the outward cargo. 6. The affidavit of Messrs. Hibberson and Yonge, that they had shipped the same cargo on their own account, consigned to Messrs. Hughes and Duncan, &c. 7. The shipping articles from Amelia Island to St. Augustine, or any *other* port in Europe, and back, dated the 11th of January, 1814. 8. Shipping articles from Liverpool to St. Augustine, and back to Liverpool, without a date. 9. A license from the governor of East Florida, authorizing Messrs. Hibberson and Yonge to buy a vessel in the United States, and the copy of a bill of sale from Messrs. S. and W. Hale, of New-Hampshire, by their agent Kimbell, dated the 24th of February, 1813, together with an order of the governor, of the 6th of March, 1813, naturalizing the ship, or permitting her to sail under Spanish colours.

1817.

The Pizarro.

In the district court, the cause was heard not merely upon the ship's papers, and the testimony of the master and supercargo, (who were twice examined in open court,) but the claimants were also permitted to introduce new proofs and testimony in support of their claim, without any order for farther proof.

Feb. 27th.

Mr. *Winder*, for the appellants and captors. 1. The proprietary interest in the claimants is not proved. 2. They are excluded from the benefit of farther proof by the spoliation of papers. The court below made no order for farther proof; yet it seems to have been admitted and considered by that court, and has crept into the transcript of the record. This was an irregularity, which will be corrected by the appellate tribunal, since the case on the original evidence was free from doubt or difficulty, and condemnation ought to have ensued. The spoliation of papers is not satisfactorily accounted for by the master and supercargo, who have prevaricated in their examinations; and the spoliation being unexplained, inevitably leads to the exclusion of farther proof, and, consequently, to condemnation. In the case of the *Two Brothers*,[a] spoliation of papers, not being avowed with sufficient frankness by the master, was held to destroy his credit; and the defect of proof thereby induced, together with other circumstances, was deemed a cause of condemnation. In the present

_____

a 1 *Rob.* 131.  See also the   the master guilty of the spoliation
Polly, 2 *Rob.* 361.  The Rising   was excluded from farther proof
Sun, 2 *Rob.* 104.  In this last case   as to his share of the cargo.

case, *all* the documents relative to the cargo were thrown overboard, and the excuse is the same which was rejected by the English court of admiralty in the *Rising Sun.* Destroying the papers which might show the Spanish character of the *cargo* could not diminish the danger of capture by Carthaginian privateers, since the *ship* would still appear to be Spanish, and this, together with the want of documentary evidence as to the cargo, would involve both in the same fate. This explanation of the suppression of the papers is, therefore, weak and futile, and such as cannot relieve the parties from the imputation of *mala fides.* 3. The claimants contend, that the cargo is exempt from confiscation by the Spanish treaty of 1795, which recognises the rule, that free ships make free goods.[b] But the term " subjects," in the 15th

*b* ARTICLE XV.—It shall be lawful for all and singular the subjects of his Catholic Majesty, and the citizens, people, and inhabitants of the said United States, to sail with their ships, with all manner of liberty and security, no distinction being made who are the proprietors of the merchandises laden thereon, from any por to the places of those who now are, or hereafter shall be, at enmity with his Catholic Majesty or the United States. It shall be likewise lawful for the subjects and inhabitants aforesaid, to sail with the ships and merchandises aforementioned, and to trade with the same liberty and security from

ARTICULO XV. Se permitirá á todos y á cada uno de los súbditos de S. M. Católica, y á los ciudadanos pueblos y habitantes de dichos Estados, que puedan navegar con sus embarcaciones con toda libertad y seguridad, sin que haya la menor excepcion por este respecto, aunque los propietarios de las mercaderías cargadas en las referidas embarcaciones vengan del puerto que quieran, y las traygan destinadas á qualquiera plaza de una potencia actualmente enemiga ó que lo sea despues, así de S. M. Católica como de los Estados Unidos. Se permitirá igualmente á los súbditos y habitantes mencionados na-

and 16th articles, must be understood of subjects who owe a permanent allegiance to the crown of Spain,

the places, ports, and havens, of those who are enemies of both or either party, without any opposition or disturbance whatsoever, not only directly from the places of the enemy aforementioned, to neutral places, but also from one place belonging to an enemy, to another place belonging to an enemy, whether they be under the jurisdiction of the same prince, or under several: and it is hereby stipulated, that free ships shall also give freedom to goods, and that every thing shall be deemed free and exempt which shall be found on board the ships belonging to the subjects of either of the contracting parties, although the whole lading, or any part thereof, should appertain to the enemies of either : contraband goods being always excepted. It is also agreed, that the same liberty be extended to persons who are on board a free ship, so that although they be enemies to either party, they shall not be made prisoners or taken out of that free ship, unless they are soldiers, and in actual service of the enemies.

vegar con sus buques y mercaderías, y freqüentar con igual libertad y seguridad las plazas y puertos de las potencias enemigas de las partes contratantes, ó de una de ellas sin oposicion ú obstáculo, y de comerciar no solo desde los puertos de dicho enemigo à un puerto neutro directamente, si no tambien desde uno enemigo à otro tal, bien se encuentre baxo su jurisdicion, ó baxo la de muchos; y se estipula tambien por el presente tratado que los buques libres asegurarán igualmente la libertad de las mercaderias, y que se juzgarán libres todos los efectos que se hallasen à bordo de los buques que perteneciesen à los súbditos de una de las partes contratantes, aun quando el cargamento por entero ó parte de él fuese de los enemigos de una de las dos, bien entendido sin embargo que el contrabando se exceptua siempre. Se ha convenido así mismo que la propia libertad gozarán los sugetos que pudiesen encontrarse à bordo del buque libre, aun quando fuesen enemigos de una de las dos partes contratantes; y por lo tanto no se podrá hacerlos prisioneros ni separarlos de dichos buques à ménos que no tengan la qualidad de militares, y esto hallandose en aquella sazon empleados en el servicio del enemigo.

not of mere domiciled merchants, such as the claimants. A vessel found without the documents re-

Article XVI.—This liberty of navigation and commerce shall extend to all kinds of merchandises, excepting those only which are distinguished by the name of contraband: and under this name of contraband, or prohibited goods, shall be comprehended arms, great guns, bombs, with the fusees, and the other things belonging to them, cannon-ball, gunpowder, match, pikes, swords, lances, spears, halberds, mortars, petards, grenades, saltpetre, musquets, musquet-ball, bucklers, helmets, breast-plates, coats of mail, and the like kinds of arms, proper for arming soldiers, musquet-rests, belts, horses with their furniture, and all other warlike instruments whatever. These merchandises which follow shall not be reckoned among contraband or prohibited goods: That is to say, all sorts of cloths, and all other manufactures woven of any wool, flax, silk, cotton, or any other materials whatever; all kinds of wearing apparel, together with all species whereof they are used to be made; gold and silver, as well coined as uncoined, tin, iron, latten, copper, brass, coals; as also wheat, barley and oats, and any other kind of corn and pulse; tobacco, and likewise all manner of spices, salted and smoked flesh, salted fish, cheese and butter, beer, oils,

Articulo XVI. Esta libertad de navegacion y de comercio debe extenderse à toda especie de mercaderias exceptuando solo las que se comprehenden baxo nombre de contrabando, ó de mercaderias prohibidas, quales son las armas, canones, bombas con sus mechas, y demas cosas pertenecientes à lo mismo, balas, pólvora, mechas, picas, espadas, lanzas, dardos, alabardas, morteros, petardos, granadas, salitre, fusiles, balas, escudos, casquetes, corazas, cotas de malla, y otras armas de esta especie propias para armar á los soldados, portamosquetes, bandoleras, caballos con sus armas y otros instrumentos de guerra sean los que fueren. Pero los generos y mercaderias que se nombrarán ahora, no se comprehenderán entre los de contrabando ó cosas prohibidas, à saber: toda especie de panos y qualesquiera otras telas de lana, lino, seda, algodon, ú otras qualesquiera materias, toda especie de vestidos con las telas de que se acostumbrad hacer, el oro y la plata labrada en moneda ó no, el estano, hierro, laton, cobre, bronce, carbon, del mismo modo que la cevada, el trigo, la avena, y qualquiera otro género de legumbres. El tabaco y toda la especería, carne salada y ahumada, pescado salado, queso y manteca.

1817.

The Pizarro.

quired by the 17th article is presumptively in the same situation as if she were without any documents

wines, sugars, and all sorts of salts : and, in general, all provisions which serve for the sustenance of life : furthermore, all kinds of cotton, hemp, flax, tar, pitch, ropes, cables, sails, sailcloths, anchors, and any parts of anchors, also ships' masts, planks and wood of all kind, and all other things proper either for building or repairing ships, and all other goods whatever, which have not been worked into the form of any instrument prepared for war, by land or by sea, shall not be reputed contraband, much less, such as have been already wrought and made up for any other use ; all which shall be wholly reckoned among free goods : As likewise all other merchandises and things which are not comprehended and particularly mentioned in the foregoing enumeration of contraband goods : So that they may be transported and carried in the freest manner by the subjects of both parties, even to places belonging to an enemy, such towns or places being only excepted as are at that time besieged, blocked up, or invested. And except the cases in which any ship of war or squadron shall, in consequence of storms or other accidents at sea, be under the necessity of taking the cargo of any trading vessel or vessels,

cerveza, aceytes, vinos, azúcar, y toda especie de sal, y en general todo género de provisiones que sirvan para el sustento de la vida. Ademas toda especie de algodon, cánamo, lino, alquitran, pez, cuerdas, cables, velas, telas para velas, áncoras, y partes de que se componen. Mástites, tablas, maderas de todas especies, y qualesquiera otras cosas que sirvan para la construccion y reparacion de los buques, y otras qualesquiera materias que no tienen la forma de un instrumento preparado para la guerra por tierra ó por mar, no serán reputadas de contrabando, y ménos las que están ya preparadas para otros usos. Todas las cosas que se acaban de nombrar deben ser comprehendidas entre las mercaderías libres, lo mismo que todas las demas mercaderías y efectos que no están comprehendidos y nombrados expresamente en la enumeracion de los géneros de contrabando, de manera que podrán ser transportados y conducidos con la mayor libertad por los súbditos de las dos partes contratantes á las plazas enemigas, exceptuando sin embargo las que se hallasen en la actualidad sitiadas, bloqueadas, ó embestidas, y los casos en que algun buque de guerra ó esquadra que por efecto de avería, ú otras causas se halle

and no equivalent proof can be admitted, because the pre-existing law of nations, and tne practice of

in which case they may stop the said vessel or vessels, and furnish themselves with necessaries, giving a receipt, in order that the power to whom the said ship or war belongs, may pay for the articles so taken, according to the price thereof, at the port to which they may appear to have been destined by the ship's papers : and the two contracting parties engage, that the vessels shall not be detained longer than may be absolutely necessary for their said ships to supply themselves with necessaries : That they will immediately pay the value of the receipts, and indemnify the proprietor for all losses which he may have sustained in consequence of such transaction

"Article XVII. To the end, that all manner of dissentions and quarrels may be avoided and prevented on one side and the other, it is agreed, that in case either of the parties hereto should be engaged in a war, the ships and vessels belonging to the subjects or people of the other party must be furnished with sea-letters or passports, expressing the name, property, and bulk of the ship, as also the name and place of habitation of the master or commander of the said ship, that it may appear thereby that the ship really and truly belongs to the subjects of

en necesidad de tomar les efectos que conduzca el buque ó buques de comercio, pues en tal caso podrá detenerlos para aprovisionarse, y dar un recibo para que la potencia cuyo sea el buque que tome los efectos, los pague segun el valor que tendrian en el puerto adonde se dirigiese el propietario, segun lo expresen sus cartas de navegacion : obligandose las dos partes contratantes á no detener los buques mas de lo que sea absolutamente necesario paro aprovisionarse, pagar inmediatamente los recibos, é indemnizar todos los danos que sufra el propietario á conseqüencia de semejante suceso.

"Articulo XVII. A fin de evitar entre ambas patres toda especie de disputas y quejas, se ha convenido que en el caso de que una de las dos potencias se hallase empenada en una guerra, los buques y bastimentos pertenecientes á los súbditos ó pueblos de la otra, deberán llevar consigo patentes de mar ó pasaportes que expresen el nombre, la propiedad, y el porte del buque, como tambien el nombre y morada de su dueno y comandante de dicho buque, para que de este modo conste que pertenece real y verdaderamente á los súbditos de

1817.

The Pizarro.

prize courts under that law, though they exempt neutral property from confiscation, refuse farther proof where there has been spoliation of papers

one of the parties, which passport shall be made out and granted according to the form annexed to this treaty. They shall likewise be recalled every year, that is, if the ship happens to return home within the space of a year.

It is likewise agreed, that such ships being laden, are to be provided not only with passports as above mentioned, but also with certificates, containing the several particulars of the cargo, the place whence the ship sailed, that so it may be known whether any forbidden or contraband goods be on board the same : which certificates shall be made out by the officers of the place whence the ship sailed, in the accustomed form : And if any one shall think it fit or advisable to express in the said certificates the person to whom the goods on board belong, he may freely do so : Without which requisites they may be sent to one of the ports of the other contracting party, and adjudged by the competent tribunal, according to what is above set forth, that all the circumstances of this omission having been well examined, they shall be adjudged to be legal prizes, unless they shall give legal satisfaction of their property by testimony entirely equivalent.

una de las dos partes contratantes; y que dichos pasaportes deberán expedirse segun el modelo adjunto al presente tratado. Todos los anos deberán renovarse estos pasaportes en el caso de que el buque vuelva á su pais en el espacio de un ano.

" Igualmènte se ha conveindo en que los buques mencionados arriba, si estuviesen cargados, deberán llevar no solo los pasaportes sino tambien certificados que contengan el pormenor del cargamento, el lugar de donde ha salido el buque, y la declaracion de las mercaderías de contrabando que pudiesen hallarse a bordo, cuyos certificados deberán expedirse en la forma acostumbrada por los oficiales empleados en el lugar de donde el navio se hiciese á la vela, y si se juzgase útil y prudente expresar en dichos pasaportes là persona propietaria de las mercaderías se podrá hacer libremente, sin cuyos requisitos será conducido á uno de los puertos de la potencia respectiva, y juzgado por el tribunal competente, con arreglo á lo arriba dicho, para que examinadas bien las circunstancias de su falta, sea condenado por de buena presa si no satisfaciese legalmente con los testimonios equivalentes en un todo.

mala fide, and condemn the property as enemy's. So, also, in this case, the Spanish character of the ship cannot be established, because the claimants have forfeited the privilege of farther proof by the misconduct of their own agents, and, consequently, cannot furnish the equivalent testimony required by the 17th article. The justifiable inference is, that the property in the ship and cargo belongs to the enemy, or to citizens of the United States trading

1817.

The Pizarro.

"ARTICLE XVIII. If the ships of the said subjects, people, or inhabitants, of either of the parties, shall be met with, either sailing along the coasts or on the high seas, by any ship of war of the other, or by any privateer, the said ship of war or privateer, for the avoiding of any disorder, shall remain out of cannon shot, and may send their boats a-board the merchant ship, which they shall so meet with, and may enter her to number of two or three men only, to whom the master or commander of such ship or vessel shall exhibit his passports, concerning the property of the ship, made out according to the form inserted in this present treaty, and the ship when she shall have showed such passport, shall be free and at liberty to pursue her voyage, so as it shall not be lawful to molest or give her chace in any manner, or force her to quit her intended course."

"ARTICULO XVIII. Quando un buque perteneciente á los dichos súbditos pueblos y habitantes de una de las dos partes fuese encontrado navegando á lo largo de la costa ó en plena mar por un buque de guerra de la otra ó por un corsario, dicho buque de guerra ó corsario, á fin de evitar todo desórden, se mantendrá fuera del tiro de canon, y podrá enviar su chalupa á bordo del buque mercante, hacer entrar en él dos ó tres hombres á los quales ensenará el patron ó comandante del buque su pasaporte y demas documentos, que deberán ser conformes á lo prevenido en el presente tratado, y probará la propiedad del buque, y despues de haber exhibido semejante pasaporte y documentos, se les dexará seguir libremente su viage, sin que les sea lícito el molestarle ni procurar de modo alguno darle caza, ú obligarle á dexar el rumbo que seguia."

with the enemy, which it will not be pretended is protected by the treaty.

Mr. *Key* and the *Attorney-General* for the respondents and claimants.    1. Even the total want of papers is not a substantive ground of condemnation: it may be explained, as Sir William Scott[c] observes in the *Betsey*, alluding to the the ancient French law. 2. Nor is the spoliation of papers conclusive to exclude farther proof, and never has been so held by any tribunal whose decisions this court will respect.[d]    In this case the stupid and artless manner in which the agents of the owners acted is a proof that the latter did not participate in, nor can they be made penally responsible for, the misconduct of the former.    3. If the owner of the ship was a domiciled subject of Spain, the ship, and, consequently, the cargo, is entitled to protection under the treaty.    Commercial domicil stamps a national character for every purpose in the view of a court of prize; and if the operation of the treaty were confined to Spanish *subjects* (properly so called,) while it is extended to all persons inhabiting the United States, it would be unaccountably deficient in reciprocity.    What fortifies the contrary construction is, that the term *subjects* is several times used indiscriminately in the treaty to signify the inhabitants of both countries.    The purpose for which the documents prescribed by the treaty are required shows that a merely formal defect only authorizes detention and sending in for

c 1 *Rob.* 84.
d The Two Brothers, 1 *Rob.* 113.    The Rising Sun, 2 *Rob.* 89.

adjudication, and if "equivalent testimony" is pro-
duced, restitution must follow, though the captors
are exempt from costs and damages. *Equivalent
testimony* is that which satisfactorily proves the same
thing as that in which there was defective proof
before; and the proof we have produced is testimo-
ny more than equivalent. The form of passport al-
luded to in the 17th article is not annexed to the trea-
ty, nor is it to be found in the department of state.
The Spaniards have relied on the good faith with
which this country has always fulfilled its engage-
ments; they have neglected the form, and relied on
the spirit of the stipulation. The papers produced
are, therefore, equivalent to a formal passport; and
there is no rule by which they can be excluded, as
there was no attending circumstance of fraud in the
destruction of the original documents, and, conse-
quently, the case is unaffected by that *mala fides*
which precludes explanation from extrinsic testi-
mony.

Mr. Justice Story delivered the opinion of the
court, and after stating the facts, proceeded as fol-
lows:

A preliminary objection has been taken in the
argument at bar to the regularity of the proceedings
in this cause, and it is urged, with great earnestness
and force, that the farther proof was not admissible,
except under an explicit order of the court for this
purpose; and that the conduct of the master and su-
percargo in the suppression of the documents of the
cargo, and in prevaricating in their examination, has

1817.

The Pizarro.

March 5th.

justly forfeited the claim which the owners might otherwise have to introduce the farther proof.

The proceedings in the district court were certainly very irregular; and this court cannot but regret that so many deviations from the correct prize practice should have occurred at so late a period of the war. The ship's papers ought to have been brought into court, and verified, on oath, by the captors, and the examinations of the captured crew ought to have been taken upon the standing interrogatories, and not *viva voce* in open court.. Nor should the captured crew have been permitted to be re-examined in court. They are bound to declare the whole truth upon their first examination; and if they then fraudulently suppress any material facts, they ought not to be indulged with an opportunity to disclose what they please, or to give colour to their former statements after counsel has been taken, and they know the pressure of the cause. Public policy and justice equally point out the necessity of an inflexible adherence to this rule.

It is upon the ship's papers, and the examinations thus taken in preparatory, that the cause ought, in the first instance, to be heard in the district court; and upon such hearing it is to judge whether the cause be of such doubt as to require farther proof; and if so, whether the claimant has entitled himself to the benefit of introducing it. If the court should deny such order when it ought to be granted, or allow it when it ought to be denied, and the objection be taken by the party and appear upon the record, the appellate court can administer the proper relief.

If, however, evidence in the nature of farther proof be introduced, and no formal order or objection appear on the record, it must be presumed to have been done by consent of parties, and the irregularity is completely waived. In the present case, no exception was taken to the proceedings or evidence in the district court; and we should not, therefore, incline to reject the farther proof, even if we were of opinion that it ought not, in strictness, to have been admitted.

The objection, which is urged against the admission of the farther proof would, under other circumstances, deserve great consideration. Concealment, or even spoliation of papers, is not of itself a sufficient ground for condemnation in a prize court. It is, undoubtedly, a very awakening circumstance, calculated to excite the vigilance, and justify the suspicions of the court. But it is a circumstance open to explanation, for it may have arisen from accident, necessity, or superior force; and if the party in the first instance fairly and frankly explains it to the satisfaction of the court, it deprives him of no right to which he is otherwise entitled. If, on the other hand, the spoliation be unexplained, or the explanation appear weak and futile; if the cause labour under heavy suspicions, or there be a vehement presumption of bad faith, or gross prevarication, it is made the ground of a denial of farther proof, and condemnation ensues from defects in the evidence which the party is not permitted to supply.

In the present case there can be no doubt that there has been a gross prevarication and suppression

of testimony by the master and supercargo. No-
thing can be more loose and unsatisfactory than their
first examinations; and the new and circumstantial
details given upon their second examinations are in-
consistent with the notion of perfect good faith in
the first instance. The excuse, too, for throwing
the packet of papers overboard is certainly not
easily to be credited; for the ship's documents which
still remained on board would, in the view of a Car-
thagenian privateer, have completely established a
Spanish character. It is not, indeed, very easy to
assign an adequate motive for the destruction of the
papers. If the ship was Spanish, it was, as to Ame-
rican cruisers, immaterial to whom the cargo be-
longed; for, by our treaty with Spain, (treaty of
1795, art. 15.,) declaring that free ships shall make
free goods, the property of an enemy on board of
such a ship is just as much protected from capture
as if it were neutral. The utmost, therefore, that
this extraordinary conduct can justify on the part of
the court is to institute a more rigid scrutiny into the
character of the ship itself. If her national Spanish
character be satisfactorily made out in evidence, the
spoliation of the documentary proofs of the cargo will
present no insuperable bar to a restitution. Very
different would be the conclusion, if the case stood
upon the ground of the law of nations, unaffected by
the stipulations of a treaty.

e By the ancient French law,      Thus, by the ordinances of 1543,
spoliation of papers was a substan-   art. 43, and of 1584, art. 70, the
tive ground of condemnation.       throwing overboard of the charter

Upon a full examination of the evidence we are of opinion that the Spanish character of the ship is entirely sustained, and, therefore, the claimants are entitled to a decree of restitution. Two objections have been urged against this conclusion: 1. That the ship is not documented according to the requisitions of the treaty with Spain, and, therefore, not within the protection of that treaty. 2. That it does not

party, or other papers respecting the lading of the vessel, is declared cause of condemnation. And by the ordinance of August, 1681, *Des Prises*, art. 6, all vessels, on board of which no charter party, bills of lading, or invoices are to be found, are, together with their cargoes, declared good prize. Doubts having arisen, as to the application of this rule of evidence, in cases where sufficient papers were found remaining on board, to furnish proof of the proprietary interest, the ordinance of the 5th Sept., 1708, was rendered; by which it was provided, that every captured vessel, from which papers have been thrown overboard, shall be good prize, together with the cargo, upon proof of this fact alone, without its being necessary to examine into the nature of the papers destroyed, nor to inquire whether sufficient papers were found remaining on board to furnish evidence that the ship and the goods of her lading belonged to allies or friends. But this decision appearing too vigor-

ous in practice, Louis XIV, in a rescript of the 2d February, 1710, addressed to the Admiral of France, directed the council of prizes to apply the terms of this ordinance according to the peculiar circumstances, and the subsidiary proofs in each case. Valin is of the opinion that, though this rescript escaped the attention of the framers of the regulation of the 21st October, 1744, (the 6th article of which is entirely conformable to the ordinance of the 5th September, 1708,) yet it ought to be applied to temper the rigour of this article, according to circumstances. *Valin, sur l'Ordonnance, Ib.* And, according to the authority of a celebrated modern jurist of France, such regulations should always be tempered by wisdom and equity; they are improperly styled *laws;* and essentially variable *pro temporibus et causis.* He cites in confirmation of his opinion, that even the want or suppression of papers is not conclusive, a sentence of the council of prizes of the 27th De-

1817.

The Pizarro.

appear that Mr. Hibberson (who is a native of Great Britain) has ever been naturalized in the dominions of Spain, and therefore he is not a *subject* of Spain, within the meaning of the treaty.

As to the first objection, it is certainly true that the ship was not furnished with such a sea letter, or passport, or such certificates as are described in the 17th article of the treaty. But the want of such documents is no substantive ground for condemnation. It only justifies the capture, and authorizes the captors to send the ship into a proper port for adjudication. The treaty expressly declares, that when ships shall be found without such requisites, they may be sent into port, and adjudged by the competent tribunal; and " that all the circumstances of this omission having been well examined, they shall be adjudged to be legal prizes, unless they shall give legal satisfaction of their property by testimony entirely equivalent." It is apparent, from

cember, 1779, restoring the captured vessel, notwithstanding some papers had been thrown overboard, it being proved that the papers were not of such a nature as to show the property enemy's, and the master not being accessary to the spoliation. See the opinions of *M. Portalis*, in the cases of the *Pigou* and the *Statira*. 1 *Cranch*, 99. note, (a.) *Ib.* 104. note, (a.) The Spanish law as to spoliation, is conformable with that of France, and its application to the above case would

probably have been urged by the counsel for the captors, upon the principle of reciprocity, had they not been precluded from resorting to that argument by a former decision of the court, in the case of the Nereide, 9 *Cranch*, 388.; a majority of the judges being of opinion that the principle of reciprocity or amicable retaliation, formed no rule of judicial decision in the courts of this country, until it was prescribed as such by the legislative will. *Id.* 422.

this language, that the omission to comply with the requisites of the treaty was not intended to be fatal to the property. And, certainly, by the general law of nations, as well as by the particular stipulations of the treaty, the parties would be at liberty to give farther explanations of their conduct, and to make other proofs of their property. If, indeed, upon the original evidence, the cause should appear extremely doubtful or suspicious, and farther proof should be necessary, the grant or denial of it would rest upon the same general principles which govern the discretion of prize courts in other cases. But in the present case, there is no necessity for such farther proof, since the documents and testimony now before us, are, in our opinion, as to the proprietary interest in the ship, entirely equivalent to the passports and sea-letter required by the treaty.

As to the second objection, it assumes, as its basis, that the term " subjects," as used in the treaty, applies only to persons who, by birth or naturalization, owe a permanent allegiance to the Spanish government. It is, in our opinion, very clear that such is not the true interpretation of the language. The provisions of the treaty are manifestly designed to give reciprocal and co-extensive privileges to both countries; and to effectuate this object, the term " subjects," when applied to persons owing allegiance to Spain, must be construed in the same sense as the term " citizens," or " inhabitants," when applied to persons owing allegiance to the United States. What demonstrates the entire propriety of this construction is, that in the 18th article of the

treaty, the terms "subjects," "people," and "inhabitants," are indiscriminately used as synonymous, to designate the same persons in both countries, and in cases obviously within the scope of the preceding articles. Indeed, in the language of the law of nations, which is always to be consulted in the interpretation of treaties, a person domiciled in a country, and enjoying the protection of its sovereign, is deemed a subject of that country. He owes allegiance to the country, while he resides in it; temporary, indeed, if he has not, by birth or naturalization, contracted a permanent allegiance; but so fixed that, as to all other nations, he follows the character of that country, in war as well as in peace. The mischiefs of a different construction would be very great; for it might then be contended that ships owned by Spanish subjects could be protected by the treaty, although they were domiciled in a foreign country, with which we were at war; and yet the law of nations would, in such a predicament, pronounce them enemies. We should, therefore, have no hesitation in over-ruling this objection, even if it were proved that Mr. Hibberson was not a naturalized subject of Spain; but we think the presumption very strong that he had become, in the strictest sense of the words, a Spanish subject.

The Spanish character of the ship being ascertained, it is unnecessary to inquire into the proprietary interest of the cargo, unless so far as to ascertain that it does not belong to citizens of the United States; for the treaty would certainly not protect the property of American citizens trading with the ene-

my in Spanish ships. There is no presumption, from the evidence, that any American interest is concerned in the shipment. The whole property belonged either to British subjects or to the claimants, and we think the proofs in the cause very strongly establish it to belong as claimed.

The decree of the circuit court is affirmed with costs.

### Decree affirmed.*

*f* It is obvious that the privilege of the neutral flag of protecting enemy's property, whether conferred by treaty or by the ordinances of belligerent powers, cannot extent to a fraudulent use of the flag to cover enemy's property in the ship as well as the cargo. The Minerva, 1 *Marriott's Adm. Dec.* 235. The Cittade de Lisboa, 6 *Rob.* 358. The Eendraught, *Ib.* Note, (*a.*) During the war of the American revolution the United States, recognising the principles of the armed neutrality, exempted by an ordinance of congress all neutral vessels from capture, except such as were employed in carrying contraband goods, or soldiers, to the enemy; it was held that this exemption did not extend to a vessel which had been guilty of grossly unneutral conduct, in taking a decided part with the enemy, by combining with his subjects to wrest out of the hands of the United States and of France the advantages they had acquired over Great Britain by the rights of war in the conquest of Dominica. By the capitulation of that island, all commercial intercourse with Great Britain was interdicted. In the case in question, the vessel was purchased by neutrals in London, who supplied her with false and colourable papers, and assumed on themselves the ownership of the cargo, for a voyage from London to Dominica. The continental court of appeals, in pronouncing the vessel and cargo liable to condemnation, observed, " Had she been employed in a fair commerce, such as was consistent with the rights of neutrality, her cargo, though the property of an enemy, could not be prize; because congress had said, by their ordinance, that the rights of neutrality should extend protec-

tion to such effects and goods of an enemy. But, if the neutrality were violated, congress have not said, that such a *violated neutrality* shall give such *protection :* Nor could they have said so, without confounding all the distinctions between right and wrong." The Estern, 2 *Dall.* 36. The only treaties now subsisting between the United States and foreign powers, containing the stipulation that free ships shall make free goods, are the above treaty with Spain, that of 1782 with the Netherlands, (which, it is presumed, still subsists, notwithstanding the changes in the political situation of that country,) and the treaties with the Barbary states. The conventions between the latter and Christian powers always contain the stipulation, that the flag and pass shall protect the cargo sailing under it. In the memorable case of the Nereide, 9 *Cranch*, 388., it was contended by the counsel for the captors, that this stipulation in the Spanish treaty, taken in connexion with the law of Spain, necessarily implied the converse proposition, that *enemy's ships make enemy's goods,* which is not expressed in the treaty. But this argument was overruled by the court, who held that the treaty did not contain, either expressly or by implication, a stipulation that enemy's ships shall make enemy's goods. *Id.* 418. See *Ward on the Relative Rights and Duties of Belligerent and Neutral Powers,* 145.