229 F.3d 187 (2nd Cir. 2000)
 LEE N. KOEHLER, Petitioner-Appellant,
v.
THE BANK OF BERMUDA (NEW YORK) LIMITED, a New York Corporation, THE BANK OF BERMUDA LIMITED, a Bermuda Corporation, REEFS BEACH CLUB LIMITED, a Bermuda Corporation, and A. DAVID DODWELL, a Bermuda citizen, Defendants-Appellees.
 No. 98-9624
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: Aug., 1999.
Decided: April 10, 2000.
On Reconsideration by the Court In Banc Dissent: Sept. 28, 2000
 
 A request for a vote as to whether the panel decision should be reconsidered sua sponte by the Court in banc having been made by a judge of the Court, and a poll of the judges in regular active service having been taken, a majority of the Court has voted not to reconsider the decision in banc. The mandate shall therefore issue. Judges Leval, Calabresi and Sotomayor dissent.
 Judge CALABRESI dissents in a separate opinion.
 SOTOMAYOR, Circuit Judge, with whom Judge LEVAL concurs, dissenting from the denial of rehearing in banc:
 Federal courts may, under their alienage jurisdiction, hear controversies between "citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. 1332(a)(2) (1994). Based upon a prior holding of this Court in Matimak Trading Co. v. Khalily, 118 F.3d 76 (2d Cir. 1997), cert. denied, 522 U.S. 1091, 139 L. Ed. 2d 871, 118 S. Ct. 883 (1998), the panel in this case concluded that Bermuda corporations and a Bermuda citizen were not "citizens or subjects of a foreign state," and, therefore, that a controversy involving such parties was not within the alienage jurisdiction of the federal courts. Koehler v. Bank of Bermuda (New York) Ltd., 209 F.3d 130, 139 (2d Cir. 2000). Because a rehearing in banc would provide a much-needed opportunity for the full Court to reexamine the flawed and internationally troublesome position that corporations and individuals from territories of the United Kingdom do not fall within the alienage jurisdiction of the federal courts, I dissent from the denial of the petition for rehearing in banc.
 I.
 This is a question of "exceptional importance." Fed. R. App. P. 35(a)(2). Its import reaches well beyond our government, to our relations with foreign nations, and the access of foreign entities and individuals to the federal courts. Both the Executive Branch and the government of the United Kingdom of Great Britain and Northern Ireland have asked that we reconsider the reasoning we employed in Matimak. This Circuit's understanding of the scope of alienage jurisdiction is squarely in conflict with that of the other circuit courts that have addressed this question. When issues of such enduring significance are presented, I believe that the Court in banc should reexamine the merits of its conclusion to ensure that substantial numbers of individuals and corporations are not erroneously deprived of access to our federal courts.
 The defendants in this case include Bermuda corporations and a Bermuda citizen. Bermuda is not recognized by our State Department as an independent state. It is, rather, a "British Overseas Territory."[1] Essential to this case is the fact that despite the myriad ways in which the United Kingdom exercises dominion over Bermuda, British law terms Bermudan citizens and corporations "nationals," but not "subjects," of the United Kingdom. See United Kingdom Government's Diplomatic Service Procedure Manual, Vol. 7, Annex 1, Rules 1(b), 2(a) (1996). Previously, this Court in Matimak held that a corporation organized under the laws of Hong Kong could not sue New York defendants in federal court because Hong Kong was, at the time, a Dependent Territory of the United Kingdom, and therefore the plaintiff corporation was not a "citizen or subject" of a foreign "state."[2] Relying on Matimak, the panel here concluded that Bermuda corporations and a Bermuda citizen were not "citizens or subjects of a foreign state," 28 U.S.C. 1332(a)(2) (1994), and therefore not within our alienage jurisdiction.
 The people of Bermuda would undoubtedly be surprised to learn that they are "stateless." But this is precisely the conclusion upon which these decisions rest. See Matimak, 118 F.3d at 86 ("[Plaintiff-Hong Kong corporation] is thus stateless. And a stateless person-the proverbial man without a country-cannot sue a United States citizen under alienage jurisdiction."). Having found such entities or individuals "stateless," the panels in this case and in Matimak had no difficulty denying these litigants access to the federal courts because "the raison d'etre of alienage jurisdiction is to avoid entanglements with other sovereigns that might ensue from failure to treat the legal controversies of aliens on a national level." Matimak, 118 F.3d at 82 (internal quotation omitted). These panels implicitly reason that absent a "state," there is no sovereign to offend and therefore no cause to provide federal alienage jurisdiction.
 This assurance is undermined by the strong reaction to our decisions by the United Kingdom.[3] Whatever other intention the panels here and in Matimak may have had, there can be no doubt that the fundamental purpose of alienage jurisdiction--to void offense to foreign nations--is frustrated by the Matimak decision and its further application by this panel. Paradoxically, the country we offend by these holdings is not only a strong ally, but the very country the drafters of the alienage jurisdiction provision had in mind more than two hundred years ago when they sought to open the federal courts to foreign litigants. See Kevin R. Johnson, Why Alienage Jurisdiction? Historical Foundations and Modern Justifications over Disputes Involving Noncitizens, 21 Yale J. Int'l L. 1, 7-8 (1996) (noting the failure of state courts to enforce debts owed to British creditors following the Revolutionary War).
 This Court, in Matimak, attempted to shift responsibility for the disturbing consequences of its reasoning to the Executive Branch. Because the Department of State maintains that British Overseas Territories are not independent "states," the Matimak court reasoned that it was forced to conclude that Bermuda corporations were stateless. See Matimak, 118 F.3d at 83 (commenting that "it is for the Executive Branch, not the courts, to anticipate where potential 'entanglements' with such entities are appreciable enough to recognize sovereign status"). The Executive Branch, however, has urged us not to use the definition of "statehood" taken from the context of diplomatic recognition as a basis for denying British Overseas Territories the benefit of federal alienage jurisdiction. The Executive Branch has emphasized that to do so may cause the United States to "face an international controversy with British authorities for failure to provide a neutral forum" for individuals or corporations of a British Overseas Territory in federal court. Brief Amicus Curiae for the United States at 8, Matimak Trading Co. v. Khalily (96-9117).
 Our Circuit is alone in concluding that federal alienage jurisdiction does not extend to citizens and corporations of British Overseas Territories. The Third Circuit, largely out of deference to the Executive Branch's position that Hong Kong corporations were considered, at the time, "subject to British sovereignty," found that they fell within the federal courts' alienage jurisdiction. Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd., 181 F.3d 410, 413 (3rd Cir.1999). The Seventh Circuit has held that a Cayman Islands corporation could be sued in federal court under alienage jurisdiction, explaining that, "certainly, the exercise of American judicial authority over the citizens of a British Dependent Territory implicates this country's relationship with the United Kingdom-precisely the raison d'etre for applying alienage jurisdiction." Wilson v. Humphreys (Cayman) Ltd., 916 F.2d 1239, 1243 (7th Cir.1990), cert. denied, 499 U.S. 947, 113 L. Ed. 2d 468, 111 S. Ct. 1415 (1991). The Fourth Circuit, without discussion of the issue, has found that a Bermuda resident-apparently the same individual defendant sued in this case--was a "citizen" or "subject" of a foreign state for alienage jurisdiction purposes. Koehler v. Dodwell, 152 F.3d 304, 308 (4th Cir. 1998).
 Owing to the fact that our characterization of corporations and citizens of British Overseas Territories as "stateless" has given rise to precisely the sort of damage to foreign relations the statute was meant to avoid, it is questionable that this distinction has its origins in the statute. Nor is this dubious characterization imposed upon us by the Executive Branch, which has advocated a contrary rule. Neither has this distinction been accepted by our sister circuits. Moreover, this Circuit has previously concluded, albeit without discussion, that "there is no question" that alienage jurisdiction existed between citizens of the United States and a Bermuda corporation. Netherlands Shipmortgage Corp. v. Madias, 717 F.2d 731, 735 (2d Cir. 1983). Finally, two respected senior circuit judges from the panel in this case, Judge Jon O. Newman and Judge Richard J. Cardamone, have expressed disagreement with the merits of our precedent in Matimak. See Koehler v. Bank of Bermuda (New York) Ltd., F.3d , , n. (2d Cir. 2000). All this being the case, it seems incumbent upon us, as a full Court, to reexamine the basis upon which our panels both here and in Matimak reached their conclusions.
 II.
 An examination of the merits leads to the conclusion that Matimak misapplied the terms "citizens or subjects of a foreign state" in a fashion inconsistent with both the historical understanding of these terms and a contemporary understanding of the relationship between the United Kingdom and its Overseas Territories.
 The panel in Matimak began its analysis with the unremarkable proposition that "a foreign state is entitled to define who are its citizens or subjects." Matimak, 118 F.3d at 85 (citing, inter alia, United States v. Wong Kim Ark, 169 U.S. 649, 42 L. Ed. 890, 18 S. Ct. 456 (1898)). The court then concluded that a British Overseas Territory corporation did not fall within the scope of alienage jurisdiction because British law did not designate the corporation a "citizen" or "subject" of the United Kingdom or indicate that the corporation was under the control of the United Kingdom. Matimak, 118 F.3d at 85-6.[4]
 None would argue with the notion that a foreign state is entitled to define what persons or entities fall into its categories of "citizen "or "subject," or any other of a variety of legal forms that exist under its own domestic immigration, nationality, and commercial law. The domestic meaning that any particular country may give to the terms "citizen" or "subject" does not, however, bind our courts in determining whether an individual or entity falls within the statutory meaning of such terms as provided by our law of alienage jurisdiction. The wide disparity in meaning that exists among countries concerning such terms requires that our alienage jurisdiction be determined not according to the appearance of the words "citizen" or "subject" (or translation thereof) in the pages of a country's domestic code, but according to whether United States law deems such persons or entities to be "citizens or subjects" under our Constitution and statutes for the purpose of alienage jurisdiction. To proceed otherwise would be to "allow foreign law to deny privileges afforded under the Constitution . . . [and perhaps] unintentionally promote discrimination against certain classes of people or entities." Matimak, 118 F.3d at 89-90 (Altimari, J., dissenting).[5]
 
 
 1
 As an historical matter, the drafters of the Constitution chose the words "citizens" or "subjects" to refer to the broad category of those under the authority of a foreign power. See Bank of the United States v. Deveaux, 9 U.S. (5 Cranch) 61, 87, 3 L. Ed. 38 (1809) (Marshall, C.J.) (recognizing that the Constitution "established national tribunals for the decision of controversies between aliens and a citizen [of the United States]"), overruled in part on other grounds by Louisville, Cincinnati & Charleston R.R. Co. v. Letson, 43 U.S. (2 How.) 497, 11 L. Ed. 353 (1844). The Judiciary Act of 1789 used the word "alien" apparently as an equivalent term to "citizens" or "subjects" in the first rendering of the statutory grant of authority to exercise federal alienage jurisdiction. Compare U.S. Const. art. III, sec. 2, cl. 1 (extending jurisdiction to controversies "between a State, or the Citizens thereof, and foreign States, Citizens or Subjects") with Judiciary Act of 1789, ch. 20, 11, 1 Stat. 73, 78 (extending jurisdiction to suits in which "an alien is a party").[6] Oliver Ellsworth, the principal architect of the Judiciary Act of 1789 that contained the alienage jurisdiction provision, referred to the need to provide a federal forum for controversies between United States citizens and "foreigners." See Charles Warren, New Light on the History of the Federal Judiciary Act of 1789, 37 Harv. L. Rev. 49, 60 (1932) (quoting Letter of Oliver Ellsworth to Judge Richard Law, Apr. 30, 1789). "The Framers often referred to [non-U.S.] citizens, subjects and foreigners interchangeably," and "while foreign modes of government are hardly 'technicalities' in any other sense, the Framers apparently did not consider them relevant to the exercise of federal jurisdiction." Southern Cross Overseas, 181 F.3d at 416 (internal quotation marks and citations omitted).[7]
 
 
 2
 In 1875, the alienage jurisdiction provision was amended, replacing the term "alien" with the current reference to "citizens" or "subjects." Act of Mar. 3, 1875, 18 Stat. 470, 470. This change, causing the statute to mirror the language of the Constitution, was motivated by the need to clarify that an alien could not sue another alien in federal court, and not from dissatisfaction with the original statutory term "alien" as impermissibly broader than the terms "citizens" or "subjects" found in the Constitution. See Johnson, 21 Yale J. Int'l L. at 21.
 
 
 3
 Although early cases did not explore the precise boundaries of the terms "citizen" and "subject" as used in alienage jurisdiction, the Supreme Court did have the opportunity to interpret these same terms in other contexts. Their general use confirmed that these terms referred to a range of relationships characterized by the acceptance of the authority and protection of a sovereign and an offer of allegiance. In 1830, Justice Story, addressing the issue of United States citizenship for expatriates noted that "the rule commonly laid down in the books is, that every person who is born within the ligeance of a sovereign is a subject; and, e converso, that every person born without such allegiance is an alien." Inglis v. Trustees of the Sailor's Snug Harbor, 28 U.S. (3 Pet.) 99, 155, 7 L. Ed. 617 (1830) (Story, J).[8] In construing the terms of the Spanish Treaty of 1795, the Supreme Court in The Pizarro, 15 U.S. (2 Wheat) 227, 4 L. Ed. 226 (1817), rejected the claim that the term "subject" in the treaty applied "only to persons who, by birth or naturalization owe a permanent allegiance to the Spanish government," holding more simply that, "in the language of the law of nations . . . a person domiciled in a country, and enjoying the protection of its sovereign, is deemed a subject of that country." Id. 245-46.
 
 
 4
 It has long been established that "a corporation created by the laws of a foreign state may, for the purposes of suing and being sued in the courts of the Union, be treated as a 'citizen' or 'subject' of such a foreign state." National Steamship Co. v. Tugman, 106 U.S. 118, 121, 27 L. Ed. 87, 1 S. Ct. 58 (1882). The defendant-Bermuda corporations in this suit were created under the laws of two different countries-Bermuda and the United Kingdom-but under the laws of only one recognized "state," the United Kingdom.[9] While the Bermuda's Companies Act of 1981 provides procedures for incorporating companies in Bermuda, 6 Revised Laws of Bermuda, Title 17, Item 5, Part II (1989 & Update 1996), Bermuda and its government exist "under the sovereignty of the Crown." 6 Halsbury's Laws of England, para. 803 (4th ed. reissue, 1992).[10] All authority to make laws for the "peace, order, welfare and good government" of Bermuda is granted to the Bermuda legislature solely by the United Kingdom, which regulates Bermuda lawmaking. Id. at para. 1027.[11]
 
 
 5
 Despite this, the panel in this case stated simply that "because Bermuda is also a British Dependent Territory, Matimak governs . . . and the district court therefore lacked subject matter jurisdiction over the state law claims against the Bermuda defendants." Koehler, 209 F.3d at 139. In such cases, when our Department of State determines that a country is not a sovereign state, the more reasonable conclusion is not that its corporations are "stateless," but rather that they are subject to some other sovereign. Dependent upon the law of the United Kingdom, Bermuda corporations exist under the sovereignty of the United Kingdom. They are, for purposes of 28 U.S.C. 1332(a)(2), "subjects" of the United Kingdom.[12]
 
 
 6
 The people of Bermuda, because they live under the sovereignty of the United Kingdom, are "citizens or subjects" of the United Kingdom for purposes of alienage jurisdiction. The individual defendant in this case, like other Bermudians, is a national of the United Kingdom for purposes of its own laws. The status of being a "national" of the United Kingdom, conferred by virtue of birth in a British Overseas Territory, fits comfortably within the original meaning of "citizen" or "subject" for the purposes of alienage jurisdiction. The United Kingdom continues to function as sovereign over Bermuda, ruling over its affairs, protecting it, and enjoying the allegiance of its citizens. The narrowness with which the panels in this case and in Matimak attempted to apply the terms "citizen" and "subject" is uncharacteristic of the history of their use and the principles underlying their adoption.[13]
 
 CONCLUSION
 
 7
 Alienage jurisdiction was established by our Constitution and early statutes to strengthen our relations-particularly our commercial relations--with foreign nations. The importance of these goals has only increased with time as both international relations and global trade have become more complex and our nation has assumed a central role in both. Having deprived a considerable number of foreign entities and individuals of an opportunity to adjudicate their claims in a federal forum, the full Court should consider whether the reasoning of the panels here and in Matimak is sound. Because these panel decisions have caused a clear split in authority with the other circuit courts, and in light of the potential damage to relations between the United States and the United Kingdom and other nations, it can only be hoped that the Supreme Court chooses to address the resolution of this issue expeditiously
 
 
 
 Notes:
 
 
 [1]
 The British Overseas Territories (also referred to as "Dependent Territories") include Anguilla, Bermuda, British Indian Ocean Territory, the British Virgin Islands, the Cayman Islands, the Falkland Islands, Gibralter, Montserrat, the Pitcairn Islands, Saint Helena and dependencies, South Georgia and the South Sandwich Islands, and the Turks and Caicos Islands. See Brief Amicus Curiae of the Government of the United Kingdom of Great Britain and Northern Ireland in Support of Matimak Trading Co. as Petitioner for Writ of Certiorari at 6 n.5, Matimak Trading Co. v. Khalily (97-893) (hereinafter U.K. Matimak Brief).
 Some of the British Overseas Territories have become important commercial centers. As of 1997, 563 banks and 34,169 other companies were incorporated in the Cayman Islands, at least 8,224 businesses were incorporated in Bermuda, at least 100,000 companies were incorporated in the British Virgin Islands, and 12,911 companies were incorporated in the Turks and Caicos. See id. at 10-11. Several of these territories, including the Cayman Islands and Bermuda, are considered significant tax havens. See Mark Baker, Lost in the Judicial Wilderness: The Stateless Corporation After Matimak Trading, 19 Nw. J. Int'l L. & Bus. 130, 132 n.8 (1998) (noting that the holding in Matimak adds an "element of unpredictability" to the world of tax structuring).
 
 
 [2]
 The Matimak decision has been extensively criticized by commentators. See III Finance Ltd. v. Aegis Consumer Funding Group, Inc., No. 99 Civ. 2579, 1999 WL 1080371, at *2 (S.D.N.Y. Nov. 30, 1999) (collecting sources).
 
 
 [3]
 See U.K. Matimak Brief at 9 ("The United Kingdom is keenly concerned that the citizens and corporations of its Dependent Territories be able to bring and defend suits in neutral foreign fora concerning their global commerce."); Brief Amicus Curiae of the Government of the United Kingdom of Great Britain and Northern Ireland in Support of Appellant at 2, III Finance Ltd. v. Aegis Consumer Funding Group (No. 00-7016) (hereinafter U.K. Aegis Brief) ("The United Kingdom Government submits that it would not be in the interest of its trading relationship with the United States for the corporations of the United Kingdom Overseas Territories to be excluded from United States federal courts."); Diplomatic Note No. 13/2000 from the British Embassy in Washington, D.C. to the United States Department of State, Feb. 2, 2000 at 1 ("The United Kingdom [] views with great concern the potential application of the Matimak rationale to individual Overseas Territories residents, as well as to commercial enterprises.") .
 
 
 [4]
 Aside from the substantial authority cited for the proposition that a foreign state determines its own citizenship and nationality law, and for the relationship between the terms "citizen" and "subject," the Matimak opinion contains little authority to support its analysis of the "citizenship" or "subjecthood" of corporations in British Overseas Territories. See Matimak, 118 F.3d at 85-86. One unpublished district court opinion is cited to support the suggestion that the corporate law of the Cayman Islands, another British Overseas Territory, is "clearly independent from the United Kingdom's [law]." See id. at 86 (citing St. Germain v. West Bay Leasing, Ltd., No. 81-CV-3945 (E.D.N.Y. Sept. 30, 1982)). Another district court opinion from 1979 is cited to argue that corporations formed in Hong Kong were not given the benefit of British nationality. See id. (citing Windert Watch Co. v. Remex Elecs. Ltd., 468 F. Supp. 1242 (S.D.N.Y. 1979)). Although the Matimak opinion cites also to a leading treatise, the same treatise currently reaches the opposite conclusion from the panel. See 15 James Wm. Moore, et al., Moore's Federal Practice 102.76 (3d ed., 1999) ("A citizen of a British dependent territory is deemed to be a citizen of the United Kingdom and its Overseas Territory. Consequently, federal courts may properly invoke diversity jurisdiction over suits in which a citizen of the Cayman Islands or Bermuda is a party.").
 The cases cited by the Matimak court in support of the proposition that a stateless person cannot sue a United States citizen in federal court regard an individual whose citizenship has been revoked by a sovereign and nowhere suggest that a British Overseas Territory's people or corporations could exist in a condition of perpetual statelessness. See Matimak, 118 F.3d at 86.
 
 
 [5]
 This task is analogous to that of deciding the state of domicile of a party in a diversity action in federal court. See 28 U.S.C. 1332(a)(1) (1994) (providing federal jurisdiction for suits between "citizens of different States"). While a court may look to state law definitions of domicile and state citizenship for guidance, "determination of a litigant's state of domicile for purposes of diversity is controlled by federal common law, not by the law of any state." 15 James Wm. Moore, et. al., Moore's Federal Practice 102.34[3][a] (3d ed., 1997).
 
 
 [6]
 The legislative debates concerning the Judiciary Act of 1789 referred to the alienage jurisdiction provision as providing access to the federal courts for "foreigners" or "aliens." See 1 Annals of Congress (1st Cong.) 810, 814, 825 (Joseph Gales ed., 1834) (House debates).
 
 
 [7]
 At the time the Constitution was written and the first alienage jurisdiction statute was enacted, the term "subject" referred to a person who lived under the control of another. See Samuel Johnson, A Dictionary of the English Language (1755) (defining a "subject" as "one who lives under the dominion of another"). See also 2 Noah Webster, American Dictionary of the English Language at 84 (1st ed., 1828; facsimile ed. Foundation for American Christian Education 1985) (defining a "subject" as "one that owes allegiance to a sovereign and is governed by his laws. The natives of Great Britain are subjects of the British government. The natives of the United States, and naturalized foreigners, are subjects of the federal government. Men in free governments are subjects as well as citizens; as citizens, they enjoy rights and franchises; as subjects, they are bound to obey the laws.") (emphasis in original); 2 James Kent, Commentaries on American Law 258 n.b (6th ed., 1848) ("Subject and citizen are, in a degree, convertible terms as applied to natives; and though the term citizen seems to be appropriate to republican freemen, yet we are equally with the inhabitants of all other countries, subjects, for we are equally bound by allegiance and subjection to the government and law of the land.") (emphasis in original).
 
 
 [8]
 Justice Story continued, " two things usually concur to create citizenship; first, birth locally within the dominions of the sovereign; and secondly, birth within the protection and obedience, or in other words, within the ligenance of the sovereign. That is, the party must be born within a place where the sovereign is at the time in full possession and exercise of his power, and the party must also at his birth derive protection from, and consequently owe obedience or allegiance to the sovereign, as such, de facto." Inglis, 28 (3 Pet.) U.S. at 155.
 
 
 [9]
 The characterization of such corporations as "stateless" by the Matimak court is particularly jarring considering that corporations are creations purely of law, and, unlike individuals, exist only through an exercise of sovereignty. See Matimak, 118 F.3d at 89 (Altimari, J., dissenting) ("A stateless corporation is an oxymoron.").
 
 
 [10]
 Similarly, a corporation formed under the local Company law of Northern Ireland is not a "British" company in the sense of being formed under the British Companies Act 1985, but is nevertheless regarded by the British government as a national of the United Kingdom and therefore within the scope of 1332(a)(2). See U.K. Aegis Brief at 11.
 
 
 [11]
 Bermuda was permitted to draft a constitution by the British Parliament pursuant to the Bermuda Constitution Act 1967, 7 Halsbury's Statutes of England and Wales, Bermuda Constitution Act 1967 (4th ed., 1999 reissue), which can be revoked by an Act of the British Parliament. 6 Halsbury's Laws of England, para. 1042 (4th ed. reissue, 1992). Bermuda's government is administered by a governor appointed by the Crown, id. at para. 994, who has the power to adjourn or dissolve Bermuda's legislative assembly. Id. at para. 1000. An act dissolving the legislative assembly is deemed to be an executive act of the Queen. Id. at para. 1024 & n.1. The United Kingdom maintains supreme control over Bermuda's external relations and national defense, id. at para. 983, and has the power to alter Bermuda's boundaries. Id. at para. 992.
 
 
 [12]
 This conclusion corresponds to the position taken by the Department of State, see, e.g., Letter of Linda Jacobson, Assistant Legal Adviser of the Department of State to Alan W. Dunch (submitted in the Koehler litigation) ("It is the position of the United States . . . that Bermuda residents and corporations are subjects of a foreign state, i.e., Great Britain, for purposes of the federal diversity statute, 28 U.S.C. 1332."); Southern Cross, 181 F.3d at 417 (citing Department of State's view that "since the ultimate sovereign authority over [a Hong Kong corporation was] the British Crown, [it] should be treated as a subject of United Kingdom sovereignty for purposes of alienage diversity jurisdiction."), the Department of Justice, see, e.g., Matimak, 118 F.3d at 86 ("The Justice Department concludes that because the ultimate sovereign authority over the plaintiff is the British Crown, Matimak should be treated as a subject of United Kingdom sovereignty for purposes of 1332."), and the British government, see, e.g., U.K. Matimak Brief at 7 ("Corporations of the British Dependent Territories should be considered 'subjects' of the United Kingdom for purposes of the alienage jurisdiction of 28 U.S.C. 1332."); U.K. Aegis Brief at 4 ("The position of the United Kingdom Government is that entities incorporated in any territory for which the United Kingdom is internationally responsible are regarded by the United Kingdom Government as United Kingdom nationals and, therefore, are "citizens of subjects" of the United Kingdom for purposes of alienage jurisdiction.").
 
 
 [13]
 The reasoning of Matimak applied to all foreign corporations would produce an absurd result. The term "national" is often used instead of "citizen" or "subject" to describe the identify of a foreign corporation. See Restatement (Third) of Foreign Relations Law 213 (1987) ("For purposes of international law, a corporation has the nationality of the state under the laws of which the corporation is organized."). If indeed courts must rely solely on the words found in the domestic codes of other countries and there we discover that corporations are referred to only as "nationals" and not as "subjects" or "citizens" of a particular country, the Matimak analysis would force us to deny them access to the federal courts.
 
 
 
 8
 CALABRESI, Circuit Judge, dissenting from the denial of a rehearing in banc:
 
 
 9
 For the reasons ably stated by Judge Sotomayor in her opinion dissenting from a denial of rehearing in banc, this case involves an issue of exceptional importance. The underlying question has divided any number of federal judges. On that basis, if no other, review of the panel opinion is warranted. Accordingly, I join Judges Leval and Sotomayor in dissenting from the denial of rehearing in banc.