## UNITED STATES *v.* DOUGLAS.

*(Circuit Court, D. Massachusetts.* August 18, 1883.)

"CHINESE LABORERS"—ACT OF MAY 6, 1882.

 The term "Chinese laborers," as used in the act of congress of May 6, 1882, "to execute the treaty stipulations relating to the Chinese" contained in the treaty of 1868, as modified by the treaty of 1880, must have the same signification as when used in the treaty, and must be *held* to mean the subjects of the government of China to which the provisions of the treaty relate; and the inhibitions of the act cannot be construed to exclude from our shores laborers who are Chinese by race and language, but who are not, and never were, subjects of the emperor of China, or resident within his dominions.

Information.
*Chas. Almy, Jr.,* Asst. U. S. Atty., for the United States.
*Frank Goodwin,* for Douglas.
Before LOWELL and NELSON, JJ.

NELSON, J. This is an information against the master of the British bark Eme, for bringing and landing within the port of Boston one Ah Shong, alleged to be a Chinese laborer, contrary to section 2 of the act of congress of May 6, 1882, which makes it a misdemeanor punishable by fine and imprisonment for the master of any vessel to "knowingly bring within the United States on such vessel, and to land or permit to be landed, any Chinese laborer from any foreign port or place."

The defendant has pleaded guilty to the information, subject to the opinion of the court whether, upon certain facts which the parties agree to be true, and desire to submit to the court for determination in this form, the offense with which he is charged has been committed. The material facts, so far as they bear upon the point decided, are as follows : Ah Shong, the alleged Chinese laborer, is Chinese by race and language, as well as in appearance and dress; but he has never been a subject or lived in the dominions of the emperor of China. He was born of Chinese parentage, in the island of Hong Kong, after its cession by China to Great Britain in 1842,[1] and he is now, and has been from his birth, a subject of the queen of Great Britain. He was shipped by the master in December last at Manilla as a carpenter, under shipping articles by which he was to serve in that capacity until the return of the vessel to her port of discharge in the United Kingdom, the voyage not to exceed two years. The vessel arrived in Boston on June 8th, with Ah Shong on board. On June 19th he left the vessel without leave of the master and came ashore, taking all his effects with him, and he has since refused to return on board the vessel. He was subsequently paid off and discharged.

It is unnecessary to consider whether, upon these facts, the defendant can be said to have landed, or permitted to be landed, the man Ah Shong, for we are of opinion that upon another ground the defendant should be discharged. Another question is presented for our determination, which is this: Whether, by the act of May 6, 1882, congress intended to exclude from our shores laborers who are Chinese by race and language, but who are not and never were subjects of the emperor of China, or resident within his dominions.

To arrive at the true construction of this act of congress it is necessary to refer to the treaties existing between this country and China at and previous to its passage. In the fifth article of the treaty of July 28, 1868, known as "the Burlingame treaty," the parties thereto declare that "they cordially recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of free migration and emigration of their citizens and subjects, respectively, from the one country to the other for the purposes of curiosity, of trade, or as permanent residents." In the sixth article they agree that "citizens of the United States visiting or residing in China shall enjoy the same privileges, immunities, and exemptions, in respect to travel or residence, as may be there enjoyed by the citizens or subjects of the most favored nation ; and, reciprocally, Chinese subjects visiting or residing in the United States shall enjoy the same privileges, immunities, and exemption, in respect to travel or residence, as may there be enjoyed by the citizens or subjects of the most favored nation."

These provisions of the Burlingame treaty remained in force be-

[1] Hertslet's Treaties, vol. 6, p. 222.

tween the two countries until the conclusion of the supplementary treaty of November 17, 1880, concerning immigration. By the new treaty, the absolute right previously granted to all subjects of the Chinese government, without distinction of class, to immigrate to and reside in this country, was materially modified and restricted. The first article of the new treaty provides that—

"Whenever, in the opinion of the government of the United States, the coming of Chinese laborers to the United States, or their residence therein, affects or threatens to affect the interests of that country, or to endanger the good order of the said country, or of any locality within the territory thereof, the government of China agrees that the government of the United States may regulate, limit, or suspend such coming or residence, but may not absolutely prohibit it. The limitation or suspension shall be reasonable, and shall apply only to Chinese who may go to the United States as laborers, other classes not being included in the limitations. Legislation taken in regard to Chinese laborers will be of such a character only as is necessary to enforce the regulation, limitation, or suspension of immigration, and immigrants shall not be subject to personal maltreatment or abuse."

The second article declares that—

"Chinese subjects, whether proceeding to the United States as teachers, students, merchants, or from curiosity, together with their body and household servants, and Chinese laborers who are now in the United States, shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities, and exemptions which are accorded to the citizens and subjects of the most favored nation."

By the third article, this government guaranties against ill-treatment Chinese laborers, or Chinese of any other class, now either permanently or temporarily residing in the territory of the United States.

The fourth and last article is as follows:

"The high-contracting powers having agreed upon the foregoing articles, whenever the government of the United States shall adopt *legislative measures in accordance therewith*, such measures shall be communicated to the government of China. If the measures, as enacted, are found to work hardship upon the subjects of China, the Chinese minister at Washington may bring the matter to the notice of the secretary of state of the United States, who will consider the subject with him; and the Chinese foreign office may also bring the matter to the notice of the United States minister at Peking, and consider the subject with him, to the end that mutual and unqualified benefit may result."

As was said by Mr. Justice FIELD, in *The Case of the Chinese Merchant*, 13 FED. REP. 607, referring to the fifth and sixth articles of the Burlingame treaty:

"While these articles remained in full force no legislation by congress looking to a suspension of, or restriction upon, the immigration of Chinese, engaged in any lawful occupation, was possible without a breach of faith towards China."

The treaty itself was sufficient to secure to the Chinese all the rights granted by it, and action by congress to that end was unnecessary. But effectually to limit or suspend the immigration into this

country of Chinese laborers, which we acquired the right to do under the new treaty, active legislative measures became indispensable; and this necessity was fully recognized in the treaty and provision made in regard to it. That the purpose of the act of May 6, 1882, was to supply these measures, there can be no doubt. An examination of its provisions will show very plainly that this was its only object. With perhaps the exception of the fourteenth section, which prohibits the federal and state courts from admitting Chinese to citizenship, there is not a word in the act which indicates any other intent or purpose on the part of its framers. The title of the act is "An act to execute certain treaty stipulations relating to Chinese;" and certainly there are no "treaty stipulations relating to Chinese" which congress could be called upon to execute, except those contained in the treaties with China.

The first section of the act, after reciting, in the terms of the supplementary treaty, that "*whereas, in the opinion of the government of the United States, the coming of Chinese laborers to this country endangers the good order of certain localities within the territory thereof,*" proceeds to enact, also, in the terms of the treaty, "that from and after the expiration of ninety days next after the passage of this act, and until the expiration of ten years next after the passage of this act, *the coming of Chinese laborers to the United States be, and the same is hereby, suspended;* and during such suspension it shall not be lawful for any Chinese laborer to come, or, having so come after the expiration of said ninety days, to remain within the United States." The second section is the one upon which this information is framed. The third section provides that the two preceding sections shall not apply to Chinese laborers who were here on the seventeenth day of November, 1880, or who shall have come here before the expiration of 90 days after the passage of the act, and shall produce to the master of the vessel and the collector of the port certain prescribed certificates of identification. Sections 4 and 5 provide, "for the purpose of properly identifying Chinese laborers who were in the United States on the seventeenth day of November, 1880, or who shall have come into the same before the expiration of ninety days next after the passage of this act, and in order to furnish them with the proper evidence of their *right to go from and come to the United States of their free will and accord, as provided by the treaty between the United States and China, dated November 17, 1880,*" that lists shall be made and kept at the custom-house, which shall contain the evidence of identification of all Chinese laborers departing from the United States by sea, and that corresponding certificates shall be furnished them, which shall entitle them to return to and re-enter the United States, upon producing and delivering the same to the collector of customs. Section 6 provides "*that in order to the faithful execution of articles one and two of the treaty in this act before mentioned,*" Chinese persons who by the treaty were entitled to come to this country, shall be identified

by certificates issued by the Chinese government, which, among other things, shall state the "*former and present occupation or profession, and place of residence in China, of the person to whom the certificate is issued.*" These provisions, as well as many others that might be cited to the same effect, show conclusively that the act was passed to carry into effect the right acquired under the last treaty to exclude Chinese laborers who were subjects of the Chinese government. The same view is taken of the statute by the learned judges of the ninth circuit. In the case of *The Chinese Merchant, ubi supra,* it is said by Mr. Justice FIELD that "the act of May 6, 1882, was framed in supposed conformity with the provisions of this supplementary treaty. In the inhibitions which it imposes upon the immigration of Chinese, there is no purpose expressed in terms to go beyond the limitations prescribed by the treaty." In the *Case of George Moncan,* 14 FED. REP. 44, it is said by Judge DEADY that "this act was passed in pursuance of the treaty with China of November, 1880, supplementary to that of July 28, 1868," and that "it is not to be presumed that congress in the passage of this act intended to trench upon the treaty of 1868, as modified by that of 1880." See, also, *In re Ah Sing,* 13 FED. REP. 286; *In re Ah Tie,* Id. 291; *In re Ho King,* 14 FED. REP. 724.

The term "Chinese laborers," as used in the act, must, therefore, have the same signification as when used in the treaty, and must be held to mean the subjects of the government of China, to which the provisions of the treaty relate.

For these reasons, we are of opinion that the inhibitions of the act are not to be construed as applying to persons of the Chinese race who are not and never were subjects of or residents within the Chinese empire. As Ah Shong is a person of this description, it follows that the defendant cannot be guilty of a violation of section 2 of the act, and is therefore entitled to be discharged.