## *In re* AH LUNG.

*(Circuit Court, D. California.* September 24, 1883.)

1. **TREATIES AND LAWS—CONFLICTING PROVISIONS.**
    An act of congress upon a subject within its legislative power is as binding upon the courts as a treaty on the same subject. Both are binding, except as the latter one conflicts or interferes with the former. Whether a treaty has been violated by our legislation so as to be the proper occasion of complaint by a foreign government, is not a judicial question. To the courts, it is simply the case of conflicting laws, the last modifying or superseding the earlier.

2. **CHINESE IMMIGRATION—BRITISH SUBJECTS.**
    A Chinese laborer, born on the Island of Hong Kong after its cession to Great Britain, is within the provisions of the act of congress of May 6, 1882, restricting the immigration of Chinese laborers to the United States. The purpose of the act was to exclude laborers coming from China subject to the stipulations of the treaty of 1880 with that country, and to exclude laborers of the Chinese race coming from any other part of the world.

*Habeas Corpus.*

*Van Duser & Teare,* for petitioner.

*I. E. McElrath,* for captain of vessel.

*United States District Attorney,* for collector of port.

Before FIELD, Circuit Justice, and SAWYER, Circuit Judge.

FIELD, Justice. The petitioner sets forth that he is unlawfully restrained of his liberty, and detained on board of the steam-ship Oceanic by its captain, in the harbor of San Francisco; and that the

alleged ground of his detention is that he comes within the act of congress of May 6, 1882, "to execute certain treaty stipulations relating to Chinese." 22 St. 58.

The petitioner is a Chinese by race, language, and color, and has all the peculiarities of the subjects of China. He is also a laborer; but he was born on the Island of Hong Kong after it was ceded to Great Britain. He claims, therefore, to be a British subject, and, as such, exempt from the act of congress. But for his birth in the British dominions it is conceded that he would be within the provisions of the act. Does this fact take him out of them? The answer to this question depends upon their meaning, and not upon the fact that he owes allegiance to another sovereign than that of China. Undoubtedly the courts will always construe legislation in harmony with treaty stipulations, where its sole purpose is to carry them into effect. It will not be presumed, in the absence of clear language to that purport, that congress intended to disregard the requirements of a treaty with a foreign government, or to abrogate any of its clauses. At the same time, an act of congress must be construed according to its manifest intent, and, so far as the courts are concerned, must be enforced. A treaty is in its nature a contract between two nations, and by writers on public law is generally so treated, and not as having of itself the force of a legislative act. The constitution of the United States, however, places both treaties and laws, made in pursuance thereof, in the same category, and declares them to be the supreme law of the land. It does not give to either a paramount authority over the other. So far as a treaty operates by its own force without legislation, it is to be regarded by the courts as equivalent to a legislative act, but nothing further. If the subject to which it relates be one upon which congress can also act, that body may modify its provisions, or supersede them entirely. The immigration of foreigners to the United States, and the conditions upon which they shall be permitted to remain, are appropriate subjects of legislation as well as of treaty stipulation. No treaty can deprive congress of its power in that respect. As said by Mr. Justice CURTIS in the case of *Taylor* v. *Morton:*

"Inasmuch as treaties must continue to operate as part of our municipal law, and be obeyed by the people, applied by the judiciary, and executed by the president, while they continue unrepealed; and inasmuch as the power of repealing these municipal laws must reside somewhere, and nobody other than congress possesses it,—then legislative power is applicable to such laws whenever they relate to subjects which the constitution has placed under that legislative power." 2 Curt. C. C. 459.

An act of congress, then, upon a subject within its legislative power is as binding upon the courts as a treaty on the same subject. Both are binding, except as the latter one conflicts or interferes with the former. If the nation with whom we have made the treaty objects to the action of the legislative department, it may present its

complaint to the executive department, and take such other measures as it may deem that justice to its own citizens or subjects requires. The courts cannot heed such complaint, nor refuse to give effect to a law of congress, however much it may seem to conflict with the stipulations of the treaty. Whether a treaty has been violated by our legislation, so as to be the proper occasion of complaint by the foreign government, is not a judicial question. To the courts it is simply the case of conflicting laws, the last modifying or superseding the earlier.

The question then is, what is the true construction of the restriction act? Whom does it embrace? Some assistance in arriving at a correct conclusion will be had by reference to the treaties with China, and the circumstances leading to the passage of the act. In the fifth article of the treaty of July 28, 1868, commonly known as the "Burlingame treaty," the contracting parties declare that "they recognize the inherent and inalienable right of man to change his home and allegiance; and also the mutual advantage of the free migration and emigration of their citizens and subjects, respectively, from the one country to the other, for purposes of curiosity, of trade, or as permanent residents." In its sixth article they declare that "citizens of the United States visiting or residing in China shall enjoy the same privileges, immunities, or exemptions in respect to travel or residence as may there be enjoyed by the citizens or subjects of the most favored nation; and, reciprocally, Chinese subjects visiting or residing in the United States shall enjoy the same privileges, immunities, and exemptions, in respect to travel or residence, as may there be enjoyed by the citizens or subjects of the most favored nation." 16 St. 739.

Before these articles were adopted a great number of Chinese had emigrated to this state; and after their adoption the immigration largely increased. But, notwithstanding the favorable provisions of the treaty, it was found impossible for them to assimilate with our people. Their physical characteristics and habits kept them as distinct and separate as though still living in China. They engaged in all the industries and pursuits of the state; they came in competition with white laborers in every direction; and, as was said by us in the *Case of the Chinese Merchant*, before us last year, their frugal habits, the absence of families, their singular ability to live in narrow quarters without apparent injury to health, their contentment with the simplest fare, gave them in this competition great advantages over our laborers and mechanics. 7 Sawy. 549.[1] They could live with apparent comfort on what would prove almost starvation to white men. Our laborers and mechanics, as we also said in that case, are not content, and never should be, with the means of bare subsistence; they must have something beyond this for the comforts of

[1] S. C. 13 FED. REP. 607

a home, the support of a family, and the education of children. Competition with Chinese labor, under the conditions mentioned, was necessarily irritating and exasperating, and often led to serious collisions between persons of the two races. It was seen that without some restriction upon the immigration of Chinese, white laborers and mechanics would be driven from the state. They looked, therefore, with great apprehensions toward the crowded millions of China and of the adjacent islands in the Pacific, and felt that there was more than a possibility of such multitudes coming as to make a residence here unendurable. It was perceived by thoughtful men, looking to the possibilities of the future, that the immigration of the Chinese must be stopped if we would preserve this land for our people and their posterity, and protect the laborer from a competition degrading in its character, and ruinous to his hopes of material and social advancement.[1] There went up, therefore, most urgent appeals from the Pacific coast to the government of the United States to take such measures as would stop the further coming of Chinese laborers. The effect of these appeals was the sending of commissioners to China to negotiate for a modification of the treaty of 1868. The supplementary treaty of 1880 was the result. It authorized legislation restricting the immigration of Chinese laborers to the United States whenever our government should be of opinion that their coming would affect or threaten to affect the interests of the country, or endanger its good order, but expressly stipulated that its provisions should not apply to other classes coming to the United States. 22 St. Append. 12.

The act of May 6, 1882, followed this new treaty, and in speaking of it in the *Case of the Chinese Merchant*,[2] we said—referring to merchants as a class—that it was framed in supposed conformity with the provisions of the treaty, and that, in the inhibitions which it imposes upon the immigration of Chinese, there was no purpose expressed in terms to go beyond the limitations of the treaty. Undoubtedly, so far as the subjects of China are concerned, no purpose is shown by the act to go beyond those limitations, and that is all that was intended by language which has been supposed to have a broader meaning. It was felt necessary to obtain a modification of the treaty of 1868 before legislating with reference to the immigration of Chinese. The government of China, without such modification, would have had just ground of complaint. It was never supposed that any of the European governments having within their possessions in the east Chinese as subjects, would make any complaint to their exclusion from our country. It was well known that the English colonies in Australia had either entirely excluded or had placed under very stringent conditions the immigration of Chi-

---

[1] This is the opinion expressed, and substantially the language used, by United States senators from California.—Casserly, Sargent, Booth, Farley, and Miller.

[2] See 13 FED. REP. 607.

nese, without any objection from the mother country. The complaints there from the conflict of white with Chinese labor had been as great and as strongly expressed as any which ever arose in this state. Legislation by congress excluding or restricting the immigration would never have been so long delayed except from a desire not to offend the Chinese government. It was not deemed necessary to negotiate with other governments with respect to Chinese within their borders. So, when the act of congress was passed, it had a double purpose; it was to exclude laborers coming from China, subject to certain stipulations of the treaty of 1880, and also laborers of the Chinese race coming from any other part of the world. Its framers knew, as we all knew, that the island of Hong Kong would pour such laborers into our country every year in unnumbered thousands, unless they also were covered by the restriction act. So the act declares in its first section that from and after the expiration of ninety days from its passage, and until the expiration of ten years, the coming of Chinese laborers to the United States, without any limitation of the country from which they might come, is suspended, and during such suspension it shall not be lawful for any Chinese laborer to come, or having come, after the expiration of the ninety days to remain, within the United States.

The second section makes it a misdemeanor, punishable by fine or imprisonment, or both, for the master of a vessel knowingly to bring into the United States on his vessel, and land, or permit to be landed, *any Chinese laborer from any foreign port or place.* The language of these sections is sufficiently broad and comprehensive to embrace all Chinese laborers, without regard to the country of which they may be subjects. And the twelfth section declares that any Chinese person found unlawfully within the United States shall be removed therefrom by direction of the president to the country from whence he came—not necessarily to China.

Our attention has been called to a recent decision of Judges LOWELL and NELSON, of the circuit court of the United States for the district of Massachusetts,[1] in which they reach a different conclusion. Those judges considered that the act of congress was simply intended to exclude laborers from China within the stipulations of the supplementary treaty. Undoubtedly, as already said, that was one of its objects; but it is very evident, both from the circumstances under which it was passed and from its language, that it had a still further object. The construction which we give renders all its provisions consistent with each other. The whole purpose of the law, which was to exclude from the country laborers of the Chinese race, would be defeated by any other construction.

The release of the petitioner must be denied, and he must be returned to the ship from which he was taken. And it is so ordered.

[1] See 17 FED. REP. 634.