## NAGLE, COMMISSIONER, *v.* LOI HOA.

## NAGLE, COMMISSIONER, *v.* LAM YOUNG.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

Nos. 115 and 116. Argued December 5, 1927.—Decided January 3, 1928.

1. Under § 6 of the Chinese Exclusion Act, as amended, which provides that Chinese entitled to enter the United States shall be identified by the Chinese Government or " such other foreign Government of which at the time such Chinese person shall be a subject," the term " subject " is used in its narrower sense and includes only those who by birth or naturalization owe permanent allegiance to the government issuing the certificates. P. 477.

2. Therefore, Chinese cannot enter on a certificate of a government other than China to which they owe only temporary allegiance, though residing and transacting business within its territory. P. 477.

3. Reënactment of a statutory provision without change is a legislative approval of the practical construction that it had received. P. 481.

13 F. (2d) 80, reversed.

CERTIORARI, 273 U. S. 682, to judgments of the Circuit Court of Appeals which reversed judgments of the District Court dismissing petitions in *habeas corpus* brought by the above-named respondents against an immigration officer.

*Solicitor General Mitchell,* with whom *Assistant Attorney General Luhring* and *Messrs. Harry S. Ridgely* and *F. M. Parrish,* Attorneys in the Department of Justice, were on the brief, for petitioner.

*Messrs. George W. Hott* and *Joseph P. Fallon* were on the brief for respondents.

MR. JUSTICE STONE delivered the opinion of the Court.

Respondents, Chinese, merchants born in China and never naturalized elsewhere, applied at the port of San Francisco for admission into the United States. They had resided in French Indo-China and been engaged in business there for a number of years. They presented to the immigration authorities certificates of identification issued by officials of French Indo-China with visas by the American Consul at Saigon, French Indo-China. They were denied admission on the ground that the certificate of identification required by § 6 of the Chinese Exclusion Act, Act of. May 6, 1882, c. 126, 22 Stat. 58, 60, as amended by the Act of July 5, 1884, c. 220, 23 Stat. 115, 116, 117; U. S. C., Title 8, § 265, was a certificate of the government of which respondents were subjects, in this case the Chinese government, and not a certificate of the government of French Indo-China, where respondents merely resided. Their petitions for writs of habeas corpus were denied by the district court for northern California. On appeal the two cases were consolidated in the court of appeals for the ninth circuit, and the judgments of the district court reversed. 13 Fed. (2d) 80. This Court granted certiorari. 273 U. S. 682.

Article II of the treaty of November 17, 1880, between the United States and China, 22 Stat. 826, 827, provides for the admission of Chinese subjects "proceeding to the United States as . . . merchants." Section 15 of the Exclusion Act, as amended, makes the act applicable "to all subjects of China and Chinese, whether subjects of China or any other foreign power." Section 6 as amended (the relevant portions are in the margin[1]) requires

[1] "Sec. 6. That in order to the faithful execution of the provisions of this act, every Chinese person, other than a laborer, who may be entitled by said treaty or this act to come within the United States, and who shall be about to come to the United States, shall obtain the

"every Chinese person other than a laborer, who may be
entitled by said treaty or this act" to admission, to "ob-
tain the permission of and be identified as so entitled by
the Chinese Government, or of such other foreign Gov-
ernment of which at the time such Chinese person shall
be a subject." The sole question presented is whether
the word "subject" as used in § 6 is to be taken as includ-
ing only those persons who by birth or naturalization owe
permanent allegiance to the government issuing the cer-
tificate, or as embracing also those who, being domiciled
within the territorial limits of that government, owe it for
that reason obedience and temporary allegiance.

The word may be used in either sense. See *The Pizarro*,
2 Wheat. 227, 245; *Carlisle* v. *United States*, 16 Wall. 147,
154. If the narrower meaning be the appropriate one the
respondents were "subjects" of the Chinese government,
and it alone could issue certificates entitling them to ad-
mission. The government of French Indo-China could
issue such certificates only to persons of the Chinese race
who owed it permanent allegiance.

The circuit court of appeals thought that since the
statute was in execution of a treaty with China—which
related only to the immigration of Chinese nationals—the
provisions in § 6 for the certification of identity could
have no application to persons of Chinese race who were
nationals of other governments, and so concluded that
certificates were required of governments other than
China only in the case of Chinese nationals resident under
those governments.

But in this view it is overlooked that the amended
Exclusion Act is broader than the treaty. Before the
amendment the federal courts had not agreed whether

permission of and be identified as so entitled by the Chinese Govern-
ment, or of such other foreign Government of which at the time such
Chinese person shall be a subject. . . ."

persons of Chinese race who were nationals of countries other than China were affected by the statute. *United States* v. *Douglas,* 17 Fed. 634; *In re Ah Lung,* 18 Fed. 28. Section 15 of the amended act made all its provisions applicable " to all subjects of China and Chinese, whether subjects of China or any other foreign power." The avowed purpose of the amendment was to alter the act as interpreted in *United States* v. *Douglas, supra,* where it had been held to have no application to Chinese subjects of Great Britain. Report of Committee on Foreign Affairs, 48th Cong., 1st Sess., H. Rep. 614, p. 2.[2] The purpose, therefore, of the insertion in § 6 of the phrase " of such other foreign Government of which at the time such Chinese person shall be a subject," was to require Chinese immigrants owing permanent allegiance to governments other than China to present certificates from the governments of their allegiance.

Something may be said in support of the view that the more usual and, perhaps, more accurate use of the word " subject " is that contended for by the government. U. S. Const., Art. III, § 2; *Hammerstein* v. *Lyne,* 200 Fed. 165; Dicey, Conflict of Laws (2d ed.) 164. It is so used in our immigration and naturalization laws. Act of February 5, 1917, c. 29, § 20, 39 Stat. 874, 890; Act of June 29, 1906, c. 3592, § 4, 34 Stat. 596. It may be said also that the importance of administrative convenience

---

[2] The very fact that the amended act went beyond the scope of the treaty and affected Chinese nationals of powers other than China was one source of the objections of the Committee minority. " It is perhaps worthy of notice that this section not only attempts to make more stringent restrictive regulations against Chinese laborers, subjects of China, with whom we have some show of right, under a treaty, to make them, and against the Chinese subjects of other nations, with whom we have no such treaty stipulations, but that its other provisions unquestionably exceed the scope of the treaty with China." Report of Committee on Foreign Affairs, Views of the Minority, 48th Cong. 1st Sess., H. Rep. 614, p. 5.

and certainty in a statute of this character suggests that the word was used as indicating citizenship by birth or naturalization, a status more easily ascertained than that of domicile or residence. But these considerations need not detain us in view of the history of the legislation, to which we have already referred, and of the long and consistent practical construction of the act.

Both governments appear to have treated § 6, as amended, as requiring the certificate to be issued by the Chinese government, except where the immigrant owes permanent allegiance to another foreign government.[3] The administrative regulations of the various departments have from the first required that the certificates of Chinese subjects coming from countries other than China be issued by Chinese consular officers.[4]

---

[3] On December 6, 1884, in pursuance of the amendment of that year, the Secretary of the Treasury declared in a circular to the officers of the customs that " Chinese subjects . . . desiring to come to the United States from countries other than China, may do so on production of a certificate . . . to be issued by a Chinese diplomatic or consular officer, or if there be no such Chinese officer at such port, on a like certificate to be issued by a United States consular officer." Foreign Relations, 1885, p. 192. Although this regulation, in so far as it permits the original issue of certificates to be made by American consular officers, went beyond the statute, it clearly indicates that Chinese nationals resident abroad were required to procure certificates not from the government of their residence but from the Chinese government or an American consular officer. In the case of certain Chinese merchants resident in Hong Kong, the Chinese government requested that the statute and regulation be so applied. Memorandum, received August 5, 1885, Mr. Cheng Tsao Ju to Mr. Bayard, Foreign Relations, 1885, p. 184. To this the State Department acceded. Mr. Bayard to Cheng Tsao Ju, August 11, 1885, Foreign Relations, 1885, p. 185.

[4] Treasury circular, Dec. 6, 1884, *supra*, footnote 3; Treasury circular No. 7, January 14, 1885; Consular instruction of April 15, 1905, by the Secretary of State, 6 MS. Instructions to Diplomatic and Consular Officers; Chinese Exclusion Regulations, May 3, 1905, Department of Commerce and Labor, Rule 33; Regulations, February

This interpretation was accepted by President Cleveland in his special message of April 6, 1886.[5]  8 Richardson, Messages and Papers of the Presidents, 391.  He recommended legislation permitting the certificate in the case of Chinese nationals, resident in other foreign countries where there were no Chinese consular officers, to be issued by United States consuls in those countries.  The Chinese government has uniformly authorized its diplomatic and consular officers in foreign countries to issue such certificates in the case of Chinese subjects resident there.[6]  The validity of such certificates issued to Chinese subjects by consular officers of China in other foreign

5, 1906, Department of Commerce and Labor, Rule 30; Regulations, February 26, 1907, Department of Commerce and Labor, Rule 30; Regulations, April 18, 1910, Department of Commerce and Labor, Rule 10; Regulations, Department of Labor, January 24, 1914; *id.*, October 15, 1915; *id.*, October 27, 1916; *id.*, May 1, 1917; *id.*, October, 1920; *id.*, October 1, 1926.

[5] The President thus stated the effect of § 6: It " provides in terms for the issuance of certificates in two cases only: (a) Chinese subjects departing from a port of China; and (b) Chinese persons (i. e., of the Chinese race) who may at the time be subjects of some foreign government other than China, and who may depart for the United States from the ports of such other foreign government

    *        *        *        *        *        *        *

" It is sufficient that I should call the earnest attention of Congress to the circumstance that the statute makes no provision whatever for the somewhat numerous class of Chinese persons who, retaining their Chinese subjection in some countries other than China, desire to come from such countries to the United States."

He recognized that the amended statute went beyond the scope of the treaty by saying, "A statute is certainly most unusual which, purporting to execute the provisions of a treaty with China in respect of Chinese subjects, enacts strict formalities as regards the subjects of other governments than that of China."  8 Richardson, Messages and Papers of the Presidents, 391, 392.

[6] Mr. Tsui to Mr. Wharton, June 2, 1891, Foreign Relations, 1891, p. 457; Mr. Yang Yu to Mr. Gresham, October 10, 1893, Foreign Relations, 1893, p. 260.

countries has been recognized by the Department of State and upheld by the Attorney General.[7]

Added weight is given to this course of practical construction by the history of Article III of the treaty with China of March 17, 1894, 28 Stat. 1210, and of the later legislation reënacting the Exclusion Act. Article III provided that Chinese subjects entitled to admission might "produce a certificate from their Government or the Government where they last resided." The very fact that it. was thought necessary to incorporate this provision in the treaty is a recognition that the preëxisting legislation did not have that effect. The treaty expired by limitation in 1904 and was not renewed. While it was in force Chinese nationals, resident abroad, could be admitted to the United States on presentation of a certificate either of the Chinese government, as authorized by § 6, or of the government of their residence, as permitted by the treaty.[8] During the life of the treaty, the amended Exclusion Act, continued in force for ten years from May 5, 1892 by the act of that date, c. 60, § 1, 27 Stat. 25, would have expired. But by the Act of April 29, 1902, c. 641, § 1, 32 Stat. 176, "all laws now in force . . . regulating the coming of Chinese persons . . . into the United States . . . are hereby, reenacted, extended and continued so far as the same are not inconsistent with treaty obligations, until otherwise provided by law." By this statute the certificate provisions of § 6 of the amended Exclusion Act were continued indefinitely and, on the expiration in 1904 of the treaty of 1894, became the only law on that subject. The reën

---

[7] Mr. Wharton to Mr. Tsui, June 17, 1891, Foreign Relations, 1891, p. 459; 20 Op. Atty. Gen. 693.

[8] The Attorneys General at one time thought that the treaty provided an exclusive method of certification for Chinese nationals resident outside of China. 21 Op. Atty. Gen. 347; 22 Op. Atty. Gen. 201; but see Mr. Wu to Mr. Hay, November 7, 1898, Foreign Relations, 1899, pp. 190, 191.

actment of § 6 unchanged, and subject only to the provisions of a treaty now expired, must be accepted as a legislative approval of the practical construction the section had received. Compare *National Lead Co.* v. *United States,* 252 U. S. 140.

If there could be doubt as to the proper interpretation of § 6 standing alone, we think all ambiguity has been removed by the history of the legislation and the practical construction which has been given to it.

*Reversed.*