314

UNITED STATES, on Petition of ALBRO, ex rel. GRABER et al. v. KARNUTH, Director of Immigration, et al.*

District Court, W. D. New York. November 10, 1928.

*Order affirmed, 30 F.(2d) 242.

Botsford, Mitchell, Albro & Weber, of Buffalo, N. Y. (Preston M. Albro, of Buffalo, N. Y., of counsel), for relators.

Richard H. Templeton, U. S. Atty., of Buffalo, N. Y. (Richard A. Grimm, Asst. U. S. Atty., of Buffalo, N. Y., of counsel), for respondents.

HAZEL, District Judge. This is a rehearing of my earlier decision, handed down May 22, 1928, wherein it was decided that the relators, who were not naturalized Canadians or British subjects by birth, but were natives of Roumania domiciled in Canada, were nevertheless required to present unexpired nonimmigrant passports, duly visaed, on entering the United States, as required by executive order in effect April 1, 1928, notwithstanding their desire to enter temporarily to engage in work or business, or search for work, while maintaining their residence in Canada. Following this decision, the relator John Graber instituted an action in equity against the Secretary of Labor and the Commissioner General of Immigration in the Supreme Court of the District of Columbia, to restrain and enjoin the enforcement by them and by their subordinates of General Order 86 of the Department of Labor, held invalid by the Circuit Court of Appeals for this circuit in the Cook-Danelon Cases. United States ex rel. Cook v. Karnuth, 24 F.(2d) 649.

After hearing, a temporary injunction restraining the defendant officials from asserting the validity of General Order 86 as against the plaintiff, was granted. During the pendency of said action in the District of Columbia, which was begun following the decision by this court, the entry of the order herein remained in abeyance by consent of the government, and numerous aliens, not British subjects by birth or naturalization, were conditionally admitted, to work and search for work, on writs of habeas corpus, on the theory that the Cook-Danelon Cases inferentially permitted such conditional entry from Canada, even though not actually British subjects, since it was thought that the aliens were subjects of Great Britain within the broad interpretation of the Jay Treaty. A large number of aliens living in Canada were admitted under bond following the Cook-Danelon Cases, under the ruling of the

Supreme Court in the Pizzaro Case, 2 Wheat. 227, 4 L. Ed. 226, wherein it was held that the words "subjects," "people," and "inhabitants" are ordinarily used synonymously, and, in considering the laws of nations, a person enjoying the protection of the sovereign of the country, being a resident therein, was a subject thereof.

It is now urged by the relators that, as the evidence before the Special Board of Inquiry in the John Graber case, which is typical of the other petitioners, simply showed that they were refused admission because not possessed of a consular immigration visa, required of him or them by virtue of General Order 86, instead of a passport visa, the order of exclusion in each instance was null and void, and the writ should be sustained. The return of the government, however, in the John Graber case, alleges that he was denied admission on the ground that, being an alien, he was not in possession of an immigrant visa, quota or nonquota, "or of a passport or other official document in the nature of a passport, issued by the government to which he owes allegience, and duly visaed in accordance with regulations prescribed, covering the entry of aliens to the United States under Executive Order No. 4476, dated July 12, 1926, and signed by Calvin Coolidge," nor within the terms of the revised order dated February 21, 1928, and relating to nonimmigrants. There was no traverse of the return.

Notwithstanding the executive order, counsel urges that it nevertheless was the duty of the Board of Special Inquiry to admit the relators because of the submission by them of a passport, issued by the government of the country of their birth, to the American consul in Canada, accompanied by a request for a visa, and, upon tendering his fees, the refusal of the consul so to do was illegal. Lest there be confusion, it may be noted that the statute defines an immigrant to be an alien departing from any place outside the United States, destined for the United States, except (section 3, subdivision 2 [8 USCA § 203]) an alien visiting the United States as a tourist or temporarily for business or pleasure, and, as a condition of admission to the United States, an immigrant is required to present to the board a consular immigration visa, as provided by section 202, tit. 8, c. 6, USCA, while nonimmigrants, according to subdivision H of the Rules and Regulations of the Secretary of Labor, or aliens desiring to enter as temporary visitors or travelers, or temporarily for business or pleasure, must satisfy the examiner beyond a doubt of their status and may be admitted for a reasonable time. The executive order in effect, in so far as relevant, reads:

"*Nonimmigrants.* With the exceptions hereinafter specified, they must present passports or official documents in the nature of passports issued by the governments of the countries to which they owe allegiance, duly visaed by consular officers of the United States."

Counsel for relator substantially contends that an alien domiciled in Canada is required simply to present his passport for stamping, and, upon declaring the purpose for which he desires to enter and the length of time he wishes to remain, the consul is required to supply the stamping as evidence of identity, and the alien from Canada in search of work is entitled to enter as a nonimmigrant.

I am unable to adopt this view of the duties and functions of a consular agent, or the right of entry into the United States. The executive order, requiring passports to be visaed by a United States consular officer, was manifestly, on its original promulgation, a war measure, which later was converted by Congress into a revenue measure, for the purpose of furnishing funds for the maintenance of the consular service. The ending of the war did not abrogate the presidential order as relating to passports and visas of nonimmigrants. Upon this point it suffices to cite U. S. ex rel. London v. Phelps (C. C. A.) 22 F.(2d) 288, a case decided in November, 1927. In that case the learned court held the executive order in question valid as against a subject of Russian birth, who came to Canada on a British passport, and it could be legally extended without conditions, or limited either in its entirety or in part. See, also, Flora v. Rustad (C. C. A.) 8 F.(2d) 335.

I discover nothing in Johnson v. Keating (C. C. A.) 17 F.(2d) 50, cited by relators, to require me to hold that the American consul is without authority to obtain information from a nonimmigrant or temporary visitor to the United States for the basis of a visaed passport, or that the executive order requiring a passport visa from nonimmigrants was illegal because, instead of a war measure, it was continued as a revenue measure. The gist of the decision is that the President's powers were ended as to immigrants by the Immigration Act of 1924, while here the relator is a nonimmigrant, or an alien person, not a British sub-

ject, who desires to work in the United States. It is no doubt true that the American consul has no right to refuse a passport visa arbitrarily, but the President's power to promulgate a reasonable regulation or rule of administration for admission of non-immigrants is supported, not only by the decisions already cited, but also by section 3 of the act of 1924, defining the word "immigrant," and by subdivision H of the Rules and Regulations of the Department of Labor, to which reference has been made.

■ The contention that the relator, John Graber, who was several times examined and refused admission because of his failure to have an unexpired consular visa, was not asked whether he possessed a passport duly visaed, or that the record fails to show that he did not possess such a passport visa, and therefore the writ should be sustained for failure of proof, is, in view of the circumstances, not maintainable. The technical objection is unavailing, since it is fairly inferable that, regardless of the language of the board's conclusion, he did not possess a passport duly visaed under the executive order. The entire original argument was that no consular visa was required, and that relators had the lawful right, as residents of Canada, to pass and repass freely under the Jay Treaty, as construed in the Cook-Danelon Cases.

Even though the conclusion of the board did not strictly refer to a passport visa, as distinguished from an immigration visa, there was evidence that John Graber had no visaed passport. On his examination he presented a passport, bearing his name and photograph, issued in Roumania; but it bore no visa of any American consul. The action of the board, based on the evidence, was neither arbitrary nor unfair. The other relators, joining in the petition, it may be assumed, testified to a substantially similar effect, since no claim is made to the contrary. The case of Chryssikos v. Comm'r, etc. (C. C. A.) 3 F.(2d) 373, cited by the able counsel for relators, as to this point simply holds that the court has the right to set the exclusion order aside when there is no evidence to warrant exclusion.

■ As to the suggestion that the record shows that Roumanian passports were presented to the United States consul in Canada, who, in the performance of a ministerial duty, illegally refused to visa them, and that what should have been done may be considered as being done, is not maintainable. The direct answer to the argument is that in U. S. ex rel. London v. Phelps, 22 F.(2d) 288, wherein a similar contention was overruled, the Circuit Court of Appeals for this Circuit said: "Certainly the giving of a visé is not merely a ministerial act, because some inquiry on the spot, some determination of fact, is essential. * * *" And an unjustified "refusal to visé a passport may be ground for diplomatic complaint by the nation whose subject [is] discriminated against. See 3 Moore's Digest, 996. It is beyond the jurisdiction of the court."

It is further urged that regulation 48, promulgated by the Secretary of State, is abrogated. In terms it provides: "Temporary visitors, except under rule 8 of the Immigration Rules, July 1, 1925, for the purpose of performing labor for hire are not considered to be within the purview of section 3 (2) of the act." This regulation, I agree, was evidently issued to consular agents because of rule 86 of the Labor Department, held invalid in the Cook-Danelon Cases. However, no reference is made in the opinion of the court to the executive order of the President requiring duly visaed passports, and, indeed, no reference to it, or to the previous decision in the London Case, was necessary, for the decision, as I read it, is limited to British subjects and does not include mere aliens residing in the Dominion of Canada.

Although the original opinion herein substantially states that, because of their residence in Canada, the petitioners were entitled to be treated as British subjects for the purpose of passing and repassing under the provisions of the Jay Treaty, this view is now strongly challenged by the government. Adjudications are for the first time drawn to my attention, indicating a different class of subjects as used in treaties and in interpreting decisions, and it is contended that, in the instant cases, a narrower meaning of the term should be adopted inasmuch as relators owed no permanent allegiance to Great Britain or the Dominion of Canada. This contention, I am persuaded, is not without merit.

In Carlisle v. U. S., 16 Wall. 147, 21 L. Ed. 426, the Supreme Court said: "The citizen or subject owes an absolute and permanent allegiance to his government or sovereign, or at least until, by some open and distinct act, he renounces it and becomes a citizen or subject of another government or another sovereign. The alien, whilst domiciled in the country, owes a local and temporary allegiance, which continues during the period of his residence."

And in Dicey, Confl. Laws, pp. 173, 174, 741, it is said: "The term 'British subject' means any person who owes permanent allegiance to the crown; the words 'permanent allegiance' being used to distinguish the allegiance of a British subject from the allegiance of an alien, who, because he is within the British dominion, owes temporary allegiance to the crown."

In Nagle v. Loi Hoa, 275 U. S. 475, 48 S. Ct. 160, 72 L. Ed. 381, the Supreme Court had before it section 6 of the Chinese Exclusion Act (8 USCA § 265), providing for the identification of a Chinese person intending to enter the United States, by the Chinese government or "such other foreign government of which at the time such Chinese person" should "be a subject." The court held that the term "subject" was used in that case in its narrow sense, and included only those who by birth or naturalization owed permanent allegiance to the government issuing the certificate. In that case, as here, the relators resided in a foreign country, viz. French Indo-China, and the certificate of identification was issued by officials of French Indo-China, where the relators resided, with visas by the American consul. On arrival in this country, they were denied admission on the ground that they were not subjects of the government issuing the certificates—they having been born in China, and had not been naturalized in French Indo-China. In reversing the ruling of the lower court, the Supreme Court said that the officials of French Indo-China could issue such certificates only to persons of the Chinese race who owed it permanent allegiance, and the certificate holders were not of that class.

By analogy this decision, in my opinion, applies here. In the Cook-Danelon Cases, both relators were British subjects residing in Canada, one by birth and the other by naturalization, and obviously they owed permanent allegiance to the British Empire.

Without deeming it necessary to answer other arguments, I rule that the Cook-Danelon Cases do not strictly apply to the present situation. Though the relators reside in Canada and wish to enter the United States to work, or search for work, they are not permanent subjects of Great Britain, and do not come within the intendment of the Jay Treaty. Before entering the United States, it was necessary that they should have a passport visa, or other official document corresponding to a passport, issued by the government to which they owed allegiance and duly visaed by a consular official of the United States in compliance with the executive order to which reference has been made.

Not being so provided, the writs must be severally or collectively dismissed. So ordered.