ISAK S. GITTER, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 13874.   Promulgated October 6, 1949.

*Harold B. White, Esq.*, for the petitioner.
*Rigmor O. Carlson, Esq.*, for the respondent.

OPINION.

HILL, *Judge*: The instant case presents two questions for our de-
cision. First, did petitioner's son and daughter-in-law, Samson and

Minna Gitter, qualify as his dependents in 1943 under the provisions of section 25 (b) (2) (A) of the Internal Revenue Code as amended? Second, were petitioner's son and daughter-in-law, Samson and Minna Gitter, his sister, Hinda Schulz, and his sister and brother-in-law, Cilla and Leone Schreier, his dependents in 1944 as defined in the provisions of section 25 (b) (3) of the code as amended? In determining these matters we are aware that the statutory exemptions claimed are matters of legislative grace, and to gain relief petitioner must bring himself squarely within their terms.

Turning to the first question, what were the factual prerequisites for the status of a dependent under section 25 (b) (2) (A) of the code[1] in 1943? To qualify under this section the person claimed as a dependent must have received his chief support from the taxpayer and must have been either under the age of 18 or incapable of self-support because mentally or physically defective. Since the evidence is clear that neither Samson nor Minna Gitter earned any income in 1943, but lived on $2,800 in cash sent them by petitioner, there is no doubt he was their chief financial support in this year. Because both of the alleged dependents were over 18, the precise matter for our determination is whether either was incapable of self-support because mentally or physically defective.

We found as a fact that both Samson and Minna Gitter were fully competent to support themselves in 1943. The evidence presented by petitioner regarding Samson Gitter in 1943 does not support a conclusion that he was mentally or physically unsound. We are not satisfied from the evidence that British war-time regulations prevented Samson from obtaining employment because he was an Austrian refugee, but, assuming this was true, still section 25 (b) (2) (A) does not make involuntary unemployment in itself a ground for the status of a dependent. It is obvious that Samson was mentally and physically capable of earning a living and would have done so if he had been unable to rely on his father's generosity. The only reason Minna Gitter did not work in 1943 was the necessity of caring for her child, which is not recognized by the statute as grounds for dependency status.

We therefore conclude that neither Samson nor Minna Gitter qualified as dependents under section 25 (b) (2) (A) in 1943, and petitioner was not entitled to claim credit taxwise for their support.

---

[1] SEC. 25. CREDITS OF INDIVIDUAL AGAINST NET INCOME.

* * * * * * *

(b) CREDITS FOR BOTH NORMAL TAX AND SURTAX.—There shall be allowed for the purposes of the normal tax and the surtax the following credits against net income:

* * * * * * *

(2) CREDIT FOR DEPENDENTS.

(A) Allowance in General.—$350 for each person (other than husband or wife) dependent upon and receiving his chief support from the taxpayer if such dependent person is under eighteen years of age or is incapable of self-support because mentally or physically defective.

Turning to the second question, whether petitioner's son and daughter-in-law, Samson and Minna Gitter, his sister, Hinda Schulz, and his sister and brother-in-law, Cilla and Leone Schreier, qualified as his dependents as the term is defined in section 25 (b) (3) of the code[2] in 1944, we find there were three factual prerequisites to inclusion therein. First, persons alleged to be dependents must have fallen within one of the classes of family relationship to the taxpayer set forth in the statute. Each one claimed by petitioner as a dependent in 1944 fulfilled this requirement. Next, petitioner must have furnished over half their support. We found as a fact that Samson and Minna Gitter lived entirely on approximately $2,400 in cash given them by petitioner in 1944. Similarly, we found that Cilla and Leone Schreier were virtually penniless in 1944 and subsisted on the food, clothing, and cash of a total value of approximately $1,600 sent them by petitioner. As to Hinda Schulz, while petitioner sent her about $650 in 1944, the evidence fails to show that he furnished over half her support. Since it is not shown that this essential requirement for qualifying Hinda Schulz as a dependent was fulfilled, we hold that petitioner was not entitled to claim an exemption for her support in 1944.

Finally, a person was excluded from the status of a dependent by section 25 (b) (3) in 1944 if he was a "citizen or subject of a foreign country", residing outside the United States or a country contiguous thereto. Concededly, in that year Samson Gitter and his wife lived in England, while Cilla Schreier and her husband resided in Italy. We are convinced that all four were citizens or subjects of a foreign country in 1944 within the meaning of the statutory language. Tracing the history of their citizenship, the Samson Gitters were citizens of Austria when they left Vienna for Italy in 1934. During their stay in the latter country they made no attempt to acquire Italian citizenship. In March 1938 Germany annexed Austria and incorporated her territory into the German Reich. We do not think such annexation imposed German citizenship upon them or made them subject to Hitler's decrees, for, under generally accepted principles of international law, when a territory is transferred to a new

---

[2] (b) CREDITS FOR SURTAX ONLY.—

\* \* \* \* \* \* \*

(3) DEFINITION OF DEPENDENT.—As used in this chapter the term "dependent" means any of the following persons over half of whose support, for the calendar year in which the taxable year of the taxpayer begins, was received from the taxpayer:

(A) a son or daughter of the taxpayer, or a descendant of either.

\* \* \* \* \* \* \*

(C) a brother, sister, stepbrother, or stepsister of the taxpayer.

\* \* \* \* \* \* \*

(H) a son-in-law, daughter-in-law, father-in-law, mother-in-law, brother-in-law, or sister-in-law, of the taxpayer.

\* \* \* The term "dependent" does not include any individual who is a citizen or subject of a foreign country unless such individual is a resident of the United States or of a country contiguous to the United States. \* \* \*

sovereign by conquest or cession, the inhabitants of the territory become nationals of the new state only by their own consent, express or implied. If they voluntarily depart before the annexation and never elect to accept the sovereignty of the new government, their allegiance is not transferred, but they retain their citizenship under the old sovereign. *United States ex rel Schwarzkopf* v. *Uhl*, 137 Fed. (2d) 898, 902. The evidence does not indicate that at any time after March 1938 the Samson Gitters elected expressly or impliedly to become citizens of Germany, but rather reveals their intent to retain their Austrian nationality. They never returned to their homeland after the annexation, they stated they were Austrian citizens on their application for a visa to England in 1939, they actually traveled to England on Austrian passports later in 1939, and they made no attempt to acquire British citizenship during the period 1939 through 1944, when they lived in England. In November 1943 the United States signed a "Declaration on Austria" expressly stating therein that it considered the annexation of Austria by Germany to be null and void and that it was not bound by any changes effected in Austria since March 15, 1938. We are persuaded that by the "Declaration on Austria" the United States recognized both the independent sovereignty of Austria and the Austrian citizenship of those individuals who were nationals of that country before March 15, 1938, who elected to retain their old citizenship after their country was annexed by Germany, and who acquired no new nationality thereafter. By this standard the Gitters were Austrian citizens in 1944. This view does not conflict with *United States ex rel Schwarzkopf* v. *Uhl*, *supra*, cited by petitioner, for the facts upon which that case was based occurred prior to 1943 and the "Declaration on Austria."

Turning to the citizenship of Cilla and Leone Schreier, we find that prior to World War I they lived in Trieste as Austrians. After the first World War Trieste was incorporated into Italy. The Schreiers continued to reside in Trieste and they thereby became, by their own consent, Italian citizens. It is not at all clear that the Italian decree of November 17, 1938, stripped them of their citizenship. This statute expressly revoked "certificates of citizenship" issued to "foreign Jews" after January 1, 1919. Petitioner has not shown that the inhabitants of Trieste were considered foreigners at the time their city was transferred to Italy or that "certificates of citizenship" were issued to them when they acquired Italian citizenship. Furthermore, assuming this decree did decitizenize them, there is no proof that it was still in effect in 1944. We may not assume so in view of the change in the Italian Government and the repeal of many of Mussolini's laws which followed the liberation of Rome by the Allies in 1944. Due to these failures in petitioner's proof, it is not shown that the Leone Schreiers were not Italian citizens in 1944.

Even assuming the Gitters were not Austrian citizens and that the Schreiers were not Italian citizens in 1944, still we think they were subjects of England and Italy, respectively, in 1944 within the express language of section 25 (b) (3). What is the meaning of "subject" as used in this statute? The Supreme Court, in *Nagle* v. *Loi Hoa*, 275 U. S. 475, pointed out that the term "subject" might have a broad or narrow meaning as used in a statute, depending on the legislative purpose, stating on page 477:

* * * The sole question presented is whether the word "subject" as used in § 6 [of the Chinese Exclusion Act] is to be taken as including only those persons who by birth or naturalization owe permanent allegiance to the government issuing the certificate, or as embracing also those who, being domiciled within the territorial limits of that government, owe it for that reason obedience and temporary allegiance.

The word may be used in either sense. * * *

Therefore, to determine the meaning of "subject" in section 25 (b) (3), to decide whether the word is used in a narrow or broad sense, we turn to the legislative intent of Congress in enacting this statute.

Congressional purpose regarding the phrase "citizen or subject of a foreign country" is clearly revealed in H. Report No. 1365, 78th Cong., 2d sess., on the Individual Income Tax bill of 1944 (1944 C. B. 821, 841), wherein it said in part:

* * * the new system of exemptions grants a surtax exemption for every person closely related to the taxpayer in any of several specified degrees of relationship for whom the taxpayer provides over half the support. In addition, it is provided that the term "dependent" does not include *any nonresident alien* individual unless such individual is a resident of a country contiguous to the United States. [Italics supplied.]

Surrounding circumstances support this manifestation of Congressional intent to include any nonresident alien within the scope of "citizen or subject of a foreign country." Prior to the amendment of section 25 (b) of the code in 1944, the primary limitation on the status of a dependent was the requirement that the person be under 18 years of age or mentally or physically incapable of self-support. In that year Congress changed the test of a dependent to require a close family relationship between the taxpayer and the person supported and excluded alien citizens or subjects not residing in the United States or a country contiguous thereto. What caused this change in the criterion of a dependent? Since the commencement of World War II there had been a great increase in the number of taxpayers claiming dependency credits for Europeans whom they were helping to support. A spectacular example of this trend was the case of *Astley* v. *Rogan*, U. S. Dist. Ct., So. Dist. Calif., Central Div., June 18, 1943, memorandum opinion and order No. 1662-B, wherein the taxpayer successfully claimed dependency credits for 51 French children. In such situations a severe burden was placed upon the Commissioner to disprove the truth

of the taxpayer's assertion that he had spent specified sums on speci-
fied foreigners, whose alleged dependency, and even existence,
could not be checked. Therefore it was hardly a mere coincidence that
in 1944 Congress determined to revise section 25 (b) in the manner
set forth above. In amending the statute Congress certainly realized
that in checking the alleged dependency of a nonresident foreigner
the Commissioner was faced with the same practical difficulty whether
the latter was a citizen of a foreign country or a refugee residing
therein. Nowhere in the legislative history of the 1944 amendment of
section 25 (b) is there any express indication of Congressional purpose
to favor claims for support of foreigners who lost their citizenship over
claims for support of foreigners who retained their citizenship status.
Nor did public policy justify any distinction between them in defining
the status of a dependent, since both groups were suffering equally
from the vicissitudes of war. We conclude that Congress meant to
exclude all nonresident aliens, citizens or noncitizens, from the status
of dependents unless they resided in North America, when it used the
phrase "citizen or subject of a foreign country" residing outside the
United States or a country contiguous thereto.

Since the term "citizen" generally is restricted in its application
to an individual who enjoys full civil and economic rights of a po-
litical community and in return owes permanent allegiance to the
community, Congress must have intended "subject" to be construed
in its broad sense as including an individual domiciled in a foreign
country and thereby subject to its sovereignty. Only in this manner
would its purpose (as stated in the above cited congressional report)
to exclude any nonresident alien living outside a country contiguous
to the United States be accomplished by the language it used. Such
a construction of the term "subject" is not without precedent. See
*The Pizarro*, 2 Wheat. 227, 245, and *Carlisle* v. *United States*, 16 Wall.
147, 154. We are convinced this was the meaning of "subject" as used
in section 25 (b) (3).

It is clear that in 1944 both the Samson Gitters and the Schreiers
were subjects of a foreign country in the broad sense of the word
"subject." The Samson Gitters had been domiciled in England for
five years in 1944, enjoying the protection of its sovereignty. It is
well settled that, even as alien residents, they owed temporary alle-
giance to Great Britain, even though they did not enjoy all the civil
rights of a British citizen. The *Pizarro* and *Carlisle* cases, *supra*.
While they remained in that country, they were subject to all English
laws and regulations, and were equally amenable with citizens for
any infraction thereof. Assuming that the Italian decree of 1938
stripped the Schreiers of their citizenship and assuming that this stat-
ute was still in effect in 1944, nevertheless they remained in Italy dur-
ing the latter year. As a consequence, they continued to owe obedience

to the laws of the Italian Government and were subject to its sovereignty.

We conclude that in 1944 the Samson Gitters and the Leone Schreiers were citizens or subjects of a foreign country residing outside the United States or a country contiguous to the United States within the express language of section 25 (b) (3) and, therefore, we uphold respondent's determination that petitioner was not entitled to claim exemptions for their support in that year.

Reviewed by the Court.

*Decision will be entered for respondent.*

TURNER, *J.*, concurs only in the result.

---

OPPER, *J.*, dissenting: That petitioner's dependents were in fact "stateless" seems to me demonstrated by the tragic actualities of recent history, as exemplified by this record. Not only were these people officially driven from the countries of which they had been nationals, but all rights to look to those governments for extraterritorial support and protection had equally been withdrawn. They were merely transient "passers-through" as far as Britain was concerned. The haven that country was humane enough to offer was necessarily and expressly restricted to a temporary waiting period for the American quotas to open. If we are to be practical in dealing with this tax problem, there is no way of viewing the members of petitioner's family as "citizens or subjects" of a foreign country except by the forced construction placed upon that phrase.

The majority opinion holds that anyone who resides in a noncontiguous country is a subject of that country and, therefore, not a dependent for the purpose of section 25 (b) (3). I disagree. The statute did not need the words "who is a citizen or subject of a foreign country" if that is its meaning. In the same sentence the word "resident" is used, apparently to distinguish it from "subject"; and the succeeding subsection of the 1944 Act (section 10 (f)) refers to a "nonresident alien" who is not "a resident of a contiguous country,"[1] thus showing how Congress expresses that thought when it intends it. The present interpretation of "subject" would exclude both a citizen of the United States and a person not a citizen of any country, who happens to reside in a foreign country not contiguous to the United States. At the very least, the opinion should decide, aside from residence, whether these persons had lost their citizenship in the various countries involved.

MURDOCK, *J.*, agrees with this dissent.

---

[1]　*　　*　　*　　*　　*　　*　　*

"In the case of a nonresident alien individual who is not a resident of a contiguous country, the normal tax exemption allowed by section 25 (a) (3) shall be only $500 and the surtax exemptions allowed by section 25 (b) (1) (B) and (C) shall not be allowed."